STATE OF NEBRASKA EX REL. THE WESTERN TECHNICAL
COMMUNITY COLLEGE AREA, APPELLEE, V. KATIE TALLON,
COUNTY TREASURER OF SHERIDAN COUNTY, NEBRASKA,
ET AL., APPELLANTS.
244 N. W. 2d 183
Filed July 21, 1976. No. 40613.

Michael V. Smith of Smith & King, for appellants.

Russell E. Lovell and Russell E. Lovell, II, for appellee.

Tews & Noren and Robert G. Simmons, Jr., of Wright & Simmons, for amici curiae.

Heard before WHITE, C. J., SPENCER, BOSLAUGH, McCOWN, NEWTON, CLINTON, and BRODKEY, JJ.

NEWTON, J.

In this action respondents challenge the constitutionality of the Technical Community College Area Act of 1975 set forth in sections 79-2636 to 79-2662, R. S. Supp., 1975. The District Court upheld the constitutionality of the act and issued a peremptory writ of mandamus di-

recting respondents, members of the Board of County Commissioners and the County Treasurer of Sheridan County, Nebraska, to remit taxes levied for the support of the relator. We affirm the judgment of the District Court.

In State ex rel. Western Nebraska Technical Com. Col. Area v. Tallon, 192 Neb. 201, 219 N. W. 2d 454, this court held the former act to be unconstitutional on the ground that the act provided for a property tax to support a state purpose and was in violation of Article VIII, section 1A, of the Constitution of Nebraska. That section, as adopted in 1954 and amended in 1966, prohibits the levy of a property tax for state purposes. The substance of our former decision is embodied in the following: "Under the act with which we are concerned here, the State has assumed the direct control of major policy decisions which affect the operation of each of the seven community college areas, and the statute reflects a purpose to control the operation of all seven areas for the benefit of the residents of the state as a whole. The provisions requiring that the tuition in any technical community college area for any resident of the State of Nebraska shall be the same as for a resident of the particular area is a strong indication of the legislative purpose to benefit residents of the entire state as contrasted to residents of particular local areas. The direct control by the State over capital expenditures, the right to contract for acquisitions and additions, and to control and direct which facilities and training will be available in which area, together with the complete and direct control of the individual budget of each technical community college area, demonstrate the dominance of the State as opposed to the local areas in all major matters of control and operation of the statutory system. It is undoubtedly true that such direct control will result in a more efficient and coordinated operation and avoid expensive and uneconomical duplication of facilities and services. Those particular objectives

in themselves reflect the dominance of a purpose to benefit the state as a whole."

In view of our former holding, the Legislature has repealed the former act and adopted the 1975 version which is now before us. Does the present act do away with objectionable features noted in our former decision, nullify state control, and render the technical community college areas essentially local in character?

Each technical community college area is now a body corporate which may sue and be sued. Each is governed by a board elected from among the local citizenry. These boards determine their local programs and curriculum; employ the required faculty, administrative, and other personnel; construct, lease, or purchase required facilities; do their own accounting, auditing, and budgeting; promulgate administrative rules and regulations; have the power of eminent domain; may lease or sell property; invest their funds; establish tuition rates; issue bonds; and exercise such other powers, duties, and responsibilities as may be necessary to comply with the act. Each area is also empowered to determine and levy property taxes not exceeding $2\frac{1}{2}$ mills unless more be voted by the electors, but this is no longer compulsory.

The act also provides that the Legislature may appropriate state funds for the area colleges and distribute them on the basis of student enrollment. Provision is made for a state commission designated the Nebraska Coordinating Commission for Technical Community Colleges. This commission has general *advisory* supervision, is empowered to accept and equitably distribute federal funds, make recommendations, and provide guidance. It has little, if any, actual authority over the technical community colleges.

State aid to schools necessarily involves a commingling of state and local purposes. The interest of the state in education is evidenced by the constitutional provision for free common schools and the creation of colleges

and universities as well as elementary and high schools. Yet, in every instance where schools are locally controlled and supported, no objection has been found to a provision for state aid. No constitutional objection thereto has been called to our attention and we know of none. The mere granting of state aid does not render a school operation a state function.

We are aware of the fact that when Article VIII, section 1A, of the Constitution of Nebraska, was adopted in its original and amended form, its purpose was to require the state, after the adoption of sales and income taxes, to leave the property-tax field. No state interest or function could then be financed by means of property taxes, but all traditional state interests and functions must be financed by means other than property taxes. In other words, the state Legislature cannot avoid or circumvent the constitutional mandate by converting the traditional state functions into local functions supported by property taxes. At the time of the adoption of this constitutional provision, it was inherent in its adoption that the state would continue to administer its traditional functions and finance them by means other than a property tax. "* * * effect must be given to the intent of the framers of the organic law and of the people adopting it. This is the polestar in the construction of constitutions." 16 Am. Jur. 2d, Constitutional Law, § 64, p. 239. There is no conflicting tradition relating to state support of technical community colleges. The schools and junior colleges taken over by the technical community colleges were, at least generally, local in nature and supported by local property taxes. Those receiving state aid still were required to have local participation as provided for in the present act.

The technical community colleges are no longer dominated by a state board or subject to a compulsory property tax levy of 1 mill. The area boards exercise the same powers and functions as other political subdivisions

and the operation of each respective college is controlled by its area board. The state commission acts only as a conduit for federal funds and in an advisory capacity. It has no real power but is designed to give such assistance and advice as may be helpful in the operation of the colleges, to discourage unnecessary duplication in educational and training fields, and promote uniformity. A properly operated state commission may render it unnecessary for the Legislature to lay down a multiplicity of rules under its plenary authority. The technical community colleges are now in largely the same position as our school districts. They operate on a strictly local basis subject only to guidelines laid down by the Legislature.

"Where state and local purposes are commingled in a statutory enactment creating a new, independent, statewide system of technical community college areas, the crucial issue of the use of property tax levies to support the system turns on a determination of whether the controlling and predominant purposes are state purposes or local purposes. The application of the constitutional amendment prohibiting the State from levying a property tax for state purposes hinges on that determination." State ex rel. Western Nebraska Technical Com. Col. Area v. Tallon, *supra.*

We conclude that the present legislative act is not violative of Article VIII, section 1A, of the Constitution of Nebraska, and the judgment of the District Court is affirmed.

AFFIRMED.

CLINTON, J., dissenting.

I respectfully dissent. The majority opinion today tells the Legislature that it can avoid the prohibitions of Article VIII, section 1, of the Nebraska Constitution (the Duis amendment), insofar as future state purpose programs are concerned, provided the legislative branch of government acts in two steps. First, establish the state program and purpose and direct that it be funded

at least in part by local property taxation in violation of the amendment. Second, when the unconstitutionality of the act is determined by this court, relinquish some legislative control, but without permitting abolition of the program and purpose. Presto, the judicial wand has been waved and an unconstitutional legislative act (supporting a state purpose program with property tax) has, by legislative sleight of hand and judicial cooperation, become constitutional. Thus the Duis amendment is reduced to mere compliance with a formula or procedure, when in fact the amendment has to do with substance and effect, i.e., the exclusive allocation of the property portion of the tax base to local governments and the prohibition of state programs supported by property taxation.

I agree with the principle relied upon by the majority, to wit, in construing a constitutional provision, effect must be given to the intent of the framers of the organic law and of the people adopting it. But that principle, although stated in the majority opinion, is not given effect. Instead this court substitutes for the substance of the Duis amendment the criteria used by the court in State ex rel. Western Nebraska Technical Com. Col. Area v. Tallon, 192 Neb. 201, 219 N. W. 2d 454, in analyzing the purpose of the Nebraska Technical Community College Area Act. The drafters of the amendment and the electors who approved it were not at all concerned with procedures or formulae, they were concerned with substance and effect.

When we seek to determine the intent of the framers of the amendment and of the electors, we must look to the events which led to the adoption of the Duis amendment. This the majority opinion does not do.

As we shall later demonstrate from history, the Duis amendment was intended to accomplish several things. (1) If a state income or sales tax was later authorized by constitutional amendment and implemented by statute, then the Legislature could no longer levy a prop-

erty tax for state purposes. (2) Local governments would then have exclusive call upon the property tax portion of the whole tax base. There were also secondary intended results to be brought about by the Duis amendment. Removing the state from the property tax field would: (a) Ameliorate to a substantial degree the property valuation and equalization problems which had plagued the tax administrators and the courts, and (b) eliminate the inequities in the support of state government which resulted from the wide disparity in property tax valuations among counties and which caused property owners, having exactly the same actual value of property, to contribute vastly unequal amounts to the cost of state government.

The majority opinion pays lip service to a valid principle of constitutional construction, namely, that one must look to the "intent of the framers of the organic law and of the people adopting it," but does not even discuss the intent and purpose that the framers and the people had in mind in approving the Duis amendment. These intents and purposes are embedded in the history of the time. Recent history it is. So recent that every member of this court should easily recall it. So recent that the vast majority of the members of the Legislature which enacted Chapter 79, article 26, R. S. Supp., 1975, and its predecessor statute should remember.

In State ex rel. Western Nebraska Technical Com. Col. Area v. Tallon, *supra*, we held the Nebraska Technical Community College Area Act unconstitutional. We there had to determine whether the Legislature was doing indirectly what the Constitution prohibited it from doing directly. We, in that opinion, noted: "The provisions of section 79-2626, R. S. Supp., 1973, do not require the area boards to certify a levy of one mill. Nevertheless, they effectively enforce that result by voiding any state appropriation to an area whose mill levy is less than the maximum one mill. It should be noted here also that an appropriation of state funds has al-

ready been made at the time the area board is required to certify a property tax levy. The Legislature could not and would not approve any budget or make any appropriation to any area which did not show a one mill levy in its budget request. It is wholly unrealistic to assume that any area board will set its property tax levy at any amount less than the maximum one mill when the effect of that decision is to eliminate all state financial support. For all practical purposes the statute is mandatory in requiring a one mill levy. The result is to provide for a one mill property tax levy in every county in Nebraska to support a statewide system of technical community colleges."

The new act no longer makes the state appropriation contingent upon the property tax levy, but as a practical matter this makes no difference. The original "state purpose" still remains. The system is established. The authorized property tax levy has been raised to 2.5 mills. The maximum or near the maximum levy is being made in every college area. A statewide levy is, as a practical matter, mandated just as much as it was under the previous act and in greater amount. The record establishes that the technical college program cannot be supported on the established scale by the funds which the Legislature is willing to appropriate for the purpose, therefore, the levy of the property tax is, in effect, mandated.

The majority opinion devotes a large paragraph to listing the characteristics which make the "area essentially local in character." All such characteristics are listed. Eight of these so-called characteristics existed under the statute held unconstitutional. One of these is the amount authorized to be levied. These characteristics then can hardly be relied upon in support of holding the statute constitutional. The remaining three characteristics are: (1) Each area is expressly declared to be a corporate body and may sue and be sued; (2) each area does its own accounting and budgeting; and (3) it has power of eminent domain. I

would suggest that item (1) may have been true before, even without express declaration. Items (2) and (3) have no significance on the question in issue. The only real change in substance of the new act is the substitution of the commission for the board and the substantial restriction of the commission's powers. This alone is not enough in the light of the purpose of the Duis amendment, as I will show.

The purpose of the Duis amendment is met only if this system of state colleges is supported wholly by a state appropriation from state income and sales tax. That would have been the proper legislative response to State ex rel. Western Nebraska Technical Com. Col. Area v. Tallon, *supra*. The Legislature and this court now combine to effectively destroy the intended substantive effect of the Duis amendment.

Before looking at the events which led to the adoption of the amendment, let us state a perspective which has been partly stated in our opinion in State ex rel. Meyer v. County of Banner, *ante* p. 565, 244 N. W. 2d 179. I joined and heartily concur in that opinion where it is held that the Duis amendment was not intended to disturb traditional and historical property tax support from counties or other local taxing subdivisions for continuing governmental activities commingling state and local purposes. The framers and electors clearly did not intend to disturb those programs historically supported by local tax levies. Equally as clear is the fact they did not intend to allow the state government to thrust upon the local governments the cost of programs previously supported by the now prohibited state property tax levy. Thus far there has apparently been no attempt to evade this second purpose. Neither, of course, does the Duis amendment prohibit state support of local government and programs.

The problem arises when the Legislature mandates new programs. In such cases, since the amendment itself does not define "state purpose" and since previous

court definitions of seemingly similar phrases such as "state concern" announced in wholly different contexts (see, for example, Carlberg v. Metcalfe, 120 Neb. 481, 234 N. W. 87), can have no application, we must necessarily look to some such criteria as were set forth in State ex rel. Western Nebraska Technical Com. Col. Area v. Tallon, *supra*. That case did not say to the Legislature, "If you comply with a certain formula, the Duis amendment is not violated." In Tallon we were looking to the substance of what the Legislature had done. What the Legislature did and the effect thereof on local property taxation has not been changed by the new act.

In State ex rel. State Railway Commission v. Ramsey, 151 Neb. 333, 37 N. W. 2d 502, we said: "The meaning of a constitutional provision is to be determined as of the time of its adoption, and the intent and understanding of its framers and the people who adopted it is the principal inquiry in construing it. . . . It is permissible in determining the meaning of language of a Constitution to consider the facts of history, the evil intended to be overcome, the objects sought to be accomplished, and the scope of the remedy its terms include." See, also, First Trust Co. v. Smith, 134 Neb. 84, 277 N. W. 762; State ex rel. Sorensen v. Chicago, B. & Q. R.R. Co., 112 Neb. 248, 199 N. W. 534.

Let us now examine the events which surrounded the adoption of the Duis amendment in 1954 and the change in that constitutional provision in 1966. As amended in the latter year, it provides: "The state shall be prohibited from levying a property tax for state purposes." Art. VIII, § 1A, Constitution of Nebraska.

The Duis amendment was proposed to the people by the Sixty-Sixth Extraordinary Session of the Nebraska Legislature in 1954. Previous to that time and continuing long thereafter there occurred extensive litigation which had its genesis in the lack of uniformity of valuation and assessment of tangible property, real and per-

sonal, between counties and among individuals. On January 9, 1953, this court handed down its opinion in Laflin v. State Board of Equalization & Assessment, 156 Neb. 427, 56 N. W. 2d 469. In Laflin, a property owner in Johnson County appealed from an action of the State Board of Equalization and Assessment, contending that the board had refused to properly equalize the assessment of farmlands in various counties of the state for the taxable year 1952 in accordance with existing statutes requiring assessment at actual valuation and the constitutional provisions requiring uniformity of valuations.

Property in Nebraska, at the time of the Laflin case, was not being assessed at its actual value as required by statute. "The figures also showed that real estate in 19 counties were [sic] assessed at less than 50% of the 20-year average selling price, and that one county, Johnson County, was assessed at 82% of the 20-year average." Nebraska State Bar Association Proceedings, 1954, 34 Neb. L. Rev. 161, 342 (1954).

The 19 counties were notified to appear before a meeting of the board to show cause why their assessments should not be raised to 50 percent. Appearances were also made by Johnson County as well as by Laflin, both protesting the valuations and assessments made in Johnson County as being excessive. Laflin also argued that the excessive valuations and assessments "had the effect of requiring [him] . . . to pay a disproportionate share of the state property tax." Laflin v. State Board of Equalization & Assessment, *supra.*

The board increased the valuations of the 19 counties called before it, but " 'decided to take no action towards reducing the assessed value of farm lands and improvements in Johnson County.' " Laflin v. State Board of Equalization & Assessment, *supra.* Laflin appealed the board's determination to this court.

This court concluded, among other things, "that there was a failure to equalize between Johnson County and the remaining counties of the state," in violation of the

provisions for uniform and proportionate valuations as required by Article VIII, section 1, of the Constitution of Nebraska. The board was required by the court to "reconvene for the purpose of entering an order complying" with the court's findings, noting that it might be that "the valuations of Johnson County [could not] be properly equalized and assessed without compensating corrections in the remaining counties of the state." *Laflin v. Board of Equalization & Assessment, supra.*

Governor Crosby, on the day the Laflin decision was handed down, indicated that he had been keenly aware of the equalization problem in Nebraska. " 'This opinion points up the problem to which I devoted a section of my inaugural message when I said on the assessment of property: "We are permitting serious injustices". . . . The handing down of this opinion comes at an opportune time. A clear definition of the duty of the State Board of Equalization and Assessment is provided. The board must insist on assessments at actual value with real uniformity among counties.' " Omaha World-Herald (Morn. Ed.), Jan. 10, 1953, p. 1, col. 5. See, also, Lincoln Star, Jan. 10, 1953, p. 1, col. 8.

The Legislature reacted quickly, amending section 77-201, R. R. S. 1943 (R. S. Supp., 1953), Laws 1953, c. 265, § 1, to require that property need only be assessed at "fifty per cent of actual value" rather than a hundred percent of its actual value. Nebraska State Bar Association Proceedings, 34 Neb. L. Rev. at 343. The Governor initiated a program titled "Operation Honesty," "as a sincere effort to obtain voluntary compliance with the law [requiring persons to self-assess their personal property] and to achieve some lightening of the real estate taxes." Governor's Message to Legislature, Neb. Leg. Jour., Sixty-Sixth (Extraordinary) Session, 1954, p. 9.

There also ensued a series of political battles in which the Governor and local taxing authorities attempted to blame each other for increases in taxes resulting from

equalization requirements. See, for example, the recital in the Omaha World-Herald (Morn. Ed.), Mar. 17, 1954, p. 1, col. 7, dealing with the argument between the Governor and the Omaha school board over who was responsible for the increase in property taxes. The Governor, 5 days later on March 22, 1954, announced the need for constitutional revisions to resolve the tax problem. As the Omaha World-Herald (Morn. Ed.), Apr. 21, 1954, p. 42, col. 1, noted, the Governor's efforts to obtain constitutional changes "represent[ed] Governor Crosby's reaction to the public outcry against what had been called 'the tax mess'—meaning the higher taxes which most Nebraska property owners had to pay this spring."

Governor Crosby, on March 22, 1954, noted that problems arose "from a conscientious effort to administer the present tax laws" and determined that those problems could only be resolved by constitutional amendments. Neb. Leg. Jour., Sixty-Sixth (Extraordinary) Session, 1954, p. 10. He had noted earlier that the "Nebraska Legislature [was] working under a 'constitutional straitjacket' in writing tax legislation." Grand Island Independent, Mar. 30, 1954, p. 1, col. 5. To achieve the constitutional changes required, Governor Crosby proposed to circulate petitions to place six amendments on the November ballot. Neb. Leg. Jour., Sixty-Sixth (Extraordinary) Session, 154, p. 10; Omaha World-Herald (Morn. Ed.), Mar. 23, 1954, p. 1, col. 8. On April 5, 1954, the Governor announced that he had chosen to call a special session to handle the tax problem, rather than seeking constitutional change through the petition procedure. Omaha World-Herald (Morn. Ed.), Apr. 6, 1954, p. 1, col. 2. The Governor decided to call a special session because he and the Legislative Council Tax Committee, formed to study Nebraska's tax problem, basically agreed on five out of the six amendments he had proposed to resolve the tax problem. Lincoln Star,

Apr. 10, 1954, p. 1, col. 1; Omaha World-Herald (Morn. Ed.), Apr. 20, 1954, p. 1, col. 6.

Six proposals were given to the Legislature when it convened on April 20, 1954. One exempted household furnishings from taxation; a second permitted a homestead exemption; a third provided that county assessors should not be elected; and the fourth, which was labeled "the 'heart' of the [Governor's] tax reform program" throughout the special session (see Lincoln Star, May 4, 1954, p. 1, col. 1), sought to amend Article VIII, section 1, of the Nebraska Constitution, to allow the Legislature a greater latitude in classifying property for assessment purposes. Neb. Leg. Jour., Sixty-Sixth (Extraordinary) Session, 1954, pp. 11 to 13.

One proposed amendment, endorsed by both the Governor and the tax committee, provided for the appointment of a nonelected board to replace the elected officials serving on the State Board of Equalization and Assessment. The Governor noted that "elected officials . . . are not likely to be aggressive in equalizing assessments among the counties from year to year. It is inescapably unpopular to adjust assessments notwithstanding that the law and principles of fairness may require it to be done." Neb. Leg. Jour., Sixty-Sixth (Extraordinary) Session, 1954, p. 11.

The sixth proposition, apparently endorsed by both the Governor and the tax committee, provided the manner in which the proceeds from a sales tax were to be expended by the state government if a sales tax ever became law. The Governor specifically noted that the sales tax "would not do more than supplant a small part of the property tax burden and would do nothing toward solving the task of equalizing property taxes." Neb. Leg. Jour., Sixty-Sixth (Extraordinary) Session, 1954, p. 12.

Governor Crosby himself stated that he felt "his proposed constitutional amendments would not end the need for the State Government to equalize property tax as-

sessments." Omaha World-Herald (Morn. Ed.), Mar. 23, 1954, p. 1, col. 8. He further noted that he saw no "virtue in taking the state out of the property tax field, because I feel we need statewide equalization." Lincoln Star, Apr. 26, 1954, p. 2, col. 5.

What had happened was that because of the outcry over what was deemed an unfair and excessive tax load on property, the Legislature and the Governor sought to make the burden more palatable by constitutional change authorizing exemptions from taxation of certain classes of property as to which the most obvious inequities existed. This political process continued thereafter and it still continues. The obvious and inevitable consequence was a smaller tax base. While the tax base was being eroded, the need for tax revenue was not lessening. The new exemptions would not, of course, solve the problem of equalization. What would help would be an increased tax base such as a sales and/or income tax and a division of the tax base between the state and local governments. This is what did occur. A new and enlarged tax base was not created until the income and sales tax was adopted in 1967, but the groundwork for the division of the tax base was laid in the Duis amendment.

The Duis amendment, introduced on the first day of the special session by Senator Duis as L.B. 7 (Neb. Leg. Jour., Sixty-Sixth (Extraordinary) Session, 1954, p. 18), had the effect of taking the state out of the "statewide equalization" problem. It provided "that when a general sales tax, or an income tax, or a combination of a general sales tax and income tax, is adopted by the Legislature as a method of raising revenue for the State of Nebraska for state purposes, the state shall be prohibited from levying a property tax for state purposes." Laws 1954, c. 5, § 2, p. 65. The obvious result of eliminating a statewide property tax would be to lessen the need to equalize the imposition of that tax

between the 93 counties. Thus, a major portion of the equalization problem would be eliminated.

The floor debate on the Duis amendment, found at Neb. Leg. Jour., Sixty-Sixth (Extraordinary) Session, 1954, pp. 101 to 104, covering only a small portion of the total debate on L.B. 7, is enlightening. The discussion centered around a proposed amendment to L.B. 7 which would have permitted the state to continue to levy a property tax for "special levies." Senator Duis argued against the amendment. He noted that L.B. 7 as he proposed it put the state "entirely out" of the property tax field if a state sales and/or income tax were adopted, while the amendment to L.B. 7 would put the state "half in and half out of the property tax field should a sales tax be enacted." The amendment lost on a voice vote. Neb. Leg. Jour., Sixty-Sixth (Extraordinary) Session, 1954, p. 104.

The newspapers also defined the import of the Duis amendment in the same manner. The Omaha World-Herald defined the Duis amendment as "prohibiting all state government property taxes if the Legislature ever enacts sales and/or income taxes." Omaha World-Herald (Morn. Ed.), Apr. 25, 1954, Sec. B, p. 1, col. 1. See, also, Omaha World-Herald (Morn. Ed.) Apr. 28, 1954, p. 1, col. 8; April 29, 1954, p. 1, col. 6; May 1, 1954, p. 2, col. 8; May 3, 1954, p. 6, col. 1; May 6, 1954, p. 1, col. 2; May 7, 1954, p. 1, col. 8. The Lincoln Star stated that the Duis amendment provided that "if a sales or income tax is made law it must replace property taxes for state functions and the state would be prohibited from levying any property taxes." May 6, 1954, p. 1, col. 5. See, also, Omaha World-Herald (Morn. Ed.), Apr. 28, 1954, p. p. 1 col. 6; May 7, 1954, p. 1, col. 2; May 8, 1954, p. 3, col. 1; Nov. 4, 1954, p. 4, col. 2. The Grand Island Daily Independent defined L.B. 7 as requiring "that the state would have to step out of the property tax field in the event of enactment of a state sales or income tax." Apr. 22, 1954, p. 1, col. 2; Apr. 30, 1954, p. 1, col. 2; May

4, 1954, p. 1, col. 5; Oct. 22, 1954, p. 10, col. 1. The Norfolk Daily News described the Duis amendment as providing "that when a sales tax or income tax is adopted, the state shall be barred from levying a property tax for state purposes." Apr. 27, 1954, p. 10, col. 2; May 3, 1954, p. 8, col. 1. The Scottsbluff Star-Herald noted that the Duis amendment was "compulsive in nature. It states specifically that the state shall cease levying property taxes if and when it approves a state sales tax or a state income tax." Oct. 23, 1954, p. 2, col. 1; Apr. 21, 1954, p. 1, col. 8; Apr. 22, 1954, p. 1, col. 4. The Hastings Daily Tribune defined L.B. 7 as "taking the state out of the property tax field should [a] sales or income tax ever be enacted." Apr. 28, 1954, p. 1, col. 3; Apr. 30, 1954, p. 1, col. 1; Nov. 11, 1954, p. 14, col. 2.

Several newspapers commented on the effect of the Duis amendment on the matter of equalization. The Lincoln Star, in an article published shortly after the Laflin decision and before the 1954 special session noted that if the state were "taken out of the property tax field and another souce of revenue [was] found" the result would be that "equalization would then become merely one between individuals in a county" rather than between the 93 counties. Lincoln Star, Jan. 10, 1953, p. 1, col. 7. That, of course, was not totally correct because some taxing districts overlap county lines. A second statement made by a newspaper with respect to the relationship between the Duis amendment and the equalization problem was made by the Scottsbluff Star-Herald while the special session was debating the amendment. "[I]t opens the way for elimination of the state's annual and fruitless effort to equalize assessment values among the 93 counties, if the 1955 Legislature decides to broaden the tax base. Has this last mentioned idea been forgotten in the welter of new proposals? We had thought all along that this possible by-product of the sales tax was one of its principal virtues." Scottsbluff Star-Herald, Apr. 27, 1954, p. 2, col. 1. A third comment

by a newspaper on the equalization problem was made shortly before the November 2, 1954, election in which the Duis amendment was approved by the voters. The Grand Island Daily Independent, in discussing the pros and cons of the Duis amendment, noted that an argument "in favor of the amendment" was "that with the state [property tax] levy out of the picture, the difference in assessments between counties will not bring injustices." Grand Island Daily Independent, Oct. 22, 1954, p. 10, col. 1.

The Duis amendment as approved by the voters in 1954 read as follows: "When a general sales tax, or an income tax, or a combination of a general sales tax and income tax, is adopted by the Legislature as a method of raising revenue, the state shall be prohibited from levying a property tax for state purposes." Art. VIII, § 1A, Constitution of Nebraska. Article VIII, section 1A, was amended in 1966 to read: "The state shall be prohibited from levying a property tax for state purposes." The 1954 amendment prohibited a statewide property tax only if a sales and/or income tax was enacted, while the 1966 amended version prohibited a statewide property tax, period, no matter whether or not the Legislature had enacted a replacement tax.

A quick look at the history of the 1966 amendment will explain the reason for the change in language. In 1965 the Legislature enacted a statewide income tax to take effect January 1, 1967. Laws 1965, L.B. 797, c. 465, § 1 et seq., p. 1476, codified at § 77-2701 et seq., R. R. S. 1943 (Reissue 1966). The tax was imposed as a "flat rate irrespective of income." § 77-2703(2), R. R. S. 1943 (Reissue 1966). Before the law could take effect, the people successfully initiated a statewide referendum petition drive to place the income tax law on the November 1966, ballot. Omaha World-Herald (Morn. Ed.), Jan. 15, 1966, p. 2, col. 7. The income tax enactment was overwhelmingly rejected by the voters in the No-

vember election. Nebraska Blue Book, 1974-75, Table: Initiated and Referred Laws, p. 107.

Also in 1965, the same year the above income tax was enacted, the Legislature approved a proposal to amend the 1954 version of the Duis amendment: "When a general sales tax, or an income tax, or a combination of a general sales tax and income tax, is adopted by the Legislature as a method of raising revenue, the state shall be prohibited from levying a property tax for state purposes, except for funds to be used for capital building improvements of the state, and the Legislature shall allocate not less than twenty per cent of the proceeds from such tax to the common schools which are exclusively owned and controlled by the state or an educational governmental subdivision thereof." Laws 1965, L.B. 341, c. 295, § 1, p. 838.

The Legislature undoubtedly realized that its passage of a state income tax would completely remove the state from the property tax field unless there was a change in the Duis amendment. Senator Warner realized this when he sponsored L.B. 341 to amend the Duis amendment, and he recognized as well his amendment to the Duis amendment would require a continuing equalization between counties. He testified that his "amendment would keep the state in the property tax business at a . . . state mill levy which would be levied and all the various counties thereby requiring the equalization of taxes in their enforcement at the state level." Hearings before the Education Committee, Seventy-Fifth Session, Apr. 13, 1965, p. 7.

Many Senators, during the floor debate on L.B. 341, expressed the idea that it had been proposed with the specific purpose of keeping the state in the equalization business. Senator Carpenter: "And I might say, Senator, that the main reason, at least one of the reasons [for L.B. 341], is to see that the state does not get out of the area of equalizing between counties." Floor Debate on L.B. 341, Seventy-Fifth Session, Aug. 9, 1965,

p. 3049.  The reasons Senators wanted to retain state-wide equalization was best set out by Senator Warner, the sponsor of L.B. 341:  "[I]n visiting with students of taxation it is their most unanimous opinion that unless the state is in the property tax field, even to or though at a low amount, you are going to have equalization deteriorating very rapidly and with many subdivisions of government crossing over county lines, I don't think this is a situation with which we can put up with."  Id., Aug. 10, 1965, p. 3065.  Senator Ruhnke expressed the same sentiment at page 3065.

The above discussion would indicate that a major impetus behind the legislative approval of L.B. 341 was the fact the proposal would keep the state via its State Board of Equalization and Assessment in the equalization field.  In the November 1966 election, L.B. 341 was rejected by the people.  Nebraska Blue Book, 1974-75, Table:  Vote on Constitutional Amendments, p. 105.

In its place, the people adopted a proposal placed on the ballot by an initiative petition after the Legislature had approved L.B. 341.  The petition drive commenced on January 14, 1966 (Omaha World-Herald (Morn. Ed.), Jan. 15, 1966, p. 2, col. 7), and obtained the requisite signatures on July 20, 1966, to allow its placement on the November 1966 ballot where it was approved by the people.  Nebraska Blue Book, 1974-75, Table:  Vote on Constitutional Amendments, p. 105.

The petition drive was spearheaded by the Nebraska Farm Bureau which "had the position for many years that the cost of state government ought not to be provided by property owners."  Omaha World-Herald (Morn. Ed.), Jan. 15, 1966, p. 2, col. 7.  Newspaper articles indicated that the petition effort was aimed as much against the efforts to repeal the state income tax (referendum vote on L.B. 797) as it was aimed at the legislative amendment (L.B. 341) to the Duis amendment.  Lincoln Star, Jan. 15, 1966, p. 1, cols. 4 to 6;

Omaha World-Herald (Morn. Ed.), Jan. 15, 1966, p. 2, col. 7.

The people of Nebraska applied to the fullest the maxim that given a chance, a citizen will vote against any tax. They approved the referendum voiding the state income tax and at the same time adopted the petition-sponsored amendment barring the state from imposing a property tax. The end result was that when the Legislature met in 1967, there was no effective state tax upon which it could draw for state revenue. The Legislature passed a combination sales/income tax package with an emergency clause which was approved by the Governor on April 12, 1967. Laws 1967, L.B. 377, c. 487, § 1 et seq., p. 1533, codified at § 77-2701 et seq., R. R. S. 1943.

The foregoing history would seem to make clear that the purpose of the Duis amendment was primarily to accomplish a division of the tax base between state and local governments. It was secondarily concerned with the problem of equalization of valuation among the counties. It is directed to matters of substance and not form or procedure. The two-step legislative process which the majority opinion approves permits the Legislature to defeat in part the principal purpose of Article VIII, section 1A, of the Nebraska Constitution. Further, it will resurrect and aggravate the problems relative to the equalization of valuation of property for tax purposes which the Duis amendment was intended to lessen. The majority opinion, in my judgment, amounts simply to a reversal of our holding in State ex rel. Western Nebraska Technical Com. Col. Area v. Tallon, *supra*. I do not, of course, suggest that the majority of the court so regard it, or that it is a deliberate but veiled overruling. Unfortunately the majority has confused form with substance. State ex rel. Western Nebraska Technical Com. Col. Area v. Tallon, *supra*, was correctly decided under the Constitution and we should adhere to its result.

WHITE, C. J., joins in this dissent.

BOSLAUGH, J., dissenting in part.

I concur fully in the holding of the majority opinion that the 1975 Technical Community College Area Act is constitutional. I also concur in the holding that if the predominant purpose of a legislative act is local the activity may be financed by a property tax. The fact that a previous act in the same area was invalid is totally irrelevant so far as consideration of the 1975 act is concerned.

I do not agree that the Duis amendment is a complete restriction upon legislative discretion to convert traditional state functions into local functions. In my view the Legislature still has the power to allocate the various functions and activities of government between the state and local subdivisions as it may see fit. Functions and activities that are in fact local may be financed from sources of revenue that are available to local subdivisions.

SPENCER, J., joins in the concurrence and dissent.