GARRET C. SWANSON, PETITIONER, V. STATE OF NEBRASKA DEPARTMENT OF EDUCATION ET AL., RESPONDENTS.

544 N.W.2d 333

Filed March 1, 1996.   No. S-95-380.

Donald L. Dunn and Alan D. Slattery, of Rembolt Ludtke & Berger, for petitioner.

Edwin C. Perry, James B. Gessford, and Gregory H. Perry, of Perry, Guthery, Haase & Gessford, P.C., and Robert D. Coupland, Cherry County Attorney, for respondents.

WHITE, C.J., CAPORALE, FAHRNBRUCH, LANPHIER, WRIGHT, CONNOLLY, and GERRARD, JJ.

PER CURIAM.

This is an original action brought by Garret C. Swanson, a property owner and taxpayer in Cherry County, Nebraska. Each respondent is charged with duties relating to the implementation of 1993 Neb. Laws, L.B. 839, of the Ninety-third Legislature, First Session. As enacted, L.B. 839 adds Neb. Rev. Stat. § 79-438.13 (Reissue 1994) and amends Neb. Rev. Stat. §§ 79-101.01, 79-438.12, 79-446, 79-1303, and 79-3806 (Reissue 1994), effective as of the 1995-96 school year. In substance, the laws affect the amount of property taxes assessed against Swanson's property, as well as the distribution of those taxes, for the support of the public schools. Swanson seeks a

declaratory judgment from this court, stating that L.B. 839 violates certain provisions of the Nebraska Constitution, and further asks this court to enjoin its implementation.

A statute is presumed to be constitutional, and all reasonable doubts will be resolved in favor of its constitutionality. *Centra, Inc. v. Chandler Ins. Co.*, 248 Neb. 844, 540 N.W.2d 318 (1995); *Callan v. Balka*, 248 Neb. 469, 536 N.W.2d 47 (1995); *Chrysler Motors Corp. v. Lee Janssen Motor Co.*, 248 Neb. 322, 534 N.W.2d 309 (1995). The burden of establishing the unconstitutionality of a statute is on the one attacking its validity. *Chrysler Motors Corp., supra*; *Jones v. State*, 248 Neb. 158, 532 N.W.2d 636 (1995); *Pick v. Nelson*, 247 Neb. 487, 528 N.W.2d 309 (1995). The unconstitutionality of a statute must be clearly demonstrated before a court can declare the statute unconstitutional, and all reasonable doubts will be resolved in favor of its constitutionality. *Pick, supra*; *Hlava v. Nelson*, 247 Neb. 482, 528 N.W.2d 306 (1995); *Boll v. Department of Revenue*, 247 Neb. 473, 528 N.W.2d 300 (1995).

Swanson raises four arguments that L.B. 839 violates the Constitution of the State of Nebraska. Swanson argues first that the common levy of L.B. 839 is a classic example of a commutation of property tax, enacted in violation of Neb. Const. art. VIII, § 4; second, that the common levy results in a nonuniform levy to be assessed against taxable property in school district 31, in violation of Neb. Const. art. VIII, § 1; third, that L.B. 839 establishes a property tax for state purposes, in violation of Neb. Const. art. VIII, § 1A, because it requires the use of a common levy for determining the amount of state aid to education to be paid to individual school districts; and fourth, that the common levy constitutes a special law that solely benefits certain owners of taxable property in violation of Neb. Const. art. III, § 18. For the following reasons, we reject each of Swanson's arguments and uphold the validity of L.B. 839.

ORGANIZATION AND FUNDING UNDER L.B. 839

Nebraska school districts are statutorily divided into three primary categories: a school district maintaining only

elementary grades under the direction of a single school board (Class I); a school district maintaining both elementary and high school grades under the direction of a single school board (Classes II, III, IV, and V); and a school district maintaining only a high school under a single school board (Class VI). In 1991, the Legislature enacted bills requiring that Class I districts either be made a part of a Class VI district or affiliate with a Class II, III, IV, or V district providing K–12 education. See Neb. Rev. Stat. § 79–426.28(1) (Reissue 1994). Pursuant to this enactment, property taxes are collected within the various groupings that amount to K–12 education, such that each property owner helps to support the K–12 education that each child in the public school system ultimately receives. *Id.*

Some Class I districts have chosen to comply with § 79–426.28(1) by becoming part of an "affiliated school system," which includes a Class VI high school district and each of the Class I school districts whose students will attend that particular Class VI high school. Revenue for affiliated school systems is raised in the same way used by other K–12 school districts, in that a "common levy" is assessed within the entire affiliated school system as if it were a single district. § 79–438.12(1). Those Class I districts which have not joined an affiliated school district are required to be part of a Class VI district. Neb. Rev. Stat. § 79–402.17(1) (Reissue 1994). Prior to the passage of L.B. 839, the unaffiliated Class I districts were not treated like either the affiliated Class I districts or the K–12 districts for property tax purposes. Rather, each property owner in a Class I district paid only that amount of property tax necessary to support that particular Class I district and the Class VI district into which it "feeds."

Under L.B. 839, a Class VI school district is grouped together with each Class I school district which is part of the Class VI district to create a "Class VI school system." § 79–101.01(1)(c). The Class VI school system comprises one high school and each of the schools whose children will attend that high school. The Class VI school district and the Class I school districts maintain their independent school boards, and all continue to operate as entities independent of each other. See Neb. Rev. Stat. § 79–401 (Reissue 1994).

L.B. 839 further provides that funding for Class VI school systems will come, in part, from a common levy:

> Commencing with the 1995–96 school year, the general fund property tax requirement of the Class VI school district and each Class I school district or portion thereof in a Class VI school system shall be certified to the county superintendent and county clerk for computation of a Class VI school system tax levy. The proceeds of such levy, upon collection by the county, shall be distributed to the districts in the Class VI school system in amounts which are in proportion to the amounts of the general fund property tax requirement certified by such districts to the county superintendent and county clerk.

§ 79-438.13.

Another section of L.B. 839 impacts state equalization aid. Thereunder, the formula for establishing the amount of equalization aid due each individual Class I district within a Class VI school system is based on the resources and needs of all individual Class I and VI districts within a Class VI school system as a group, rather than on the actual resources and needs of each individual district. § 79-3806(5)(b). The practical effect is to make Class VI school systems similar to affiliated school systems with regard to equalization aid, and to render all Class I districts alike for equalization aid purposes.

Swanson owns property in school district 31, a Class I school district in Cherry County, Nebraska, located about 30 miles outside the town of Valentine. School district 31 is not part of an affiliated school system. Rather, it is part of school district 6 (Valentine High School district), an unaffiliated Class VI district. Swanson's property is thus located in both school district 31 and the Valentine High School district and is within what has become, under L.B. 839, the Valentine Class VI school system.

Under L.B. 839, each individual and autonomous district within the Valentine Class I school system will establish its budget as it did prior to L.B. 839, including the amount of state aid it will receive and its resulting general fund property tax requirements. Each district will then certify those property tax requirements to the county clerk and superintendent. The

county clerk and superintendent, after totaling all tax valuations and tax requirements of all districts within the Valentine Class VI school system, set a common levy in an amount sufficient to generate the aggregate property tax requirements for *all* districts within the system. The tax revenues are then disbursed to each Class I district based on its budgeted tax requirement, irrespective of the amount of tax dollars actually generated from property within that individual district.

## COMMUTATION OF TAX

Swanson's first argument as to how L.B. 839 violates the Constitution of the State of Nebraska is that it is a commutation of property tax, enacted in violation of Neb. Const. art. VIII, § 4. That section provides, in relevant part:

[T]he Legislature shall have no power to release or discharge any county, city, township, town, or district whatever, or the inhabitants thereof, or any corporation, or the property therein, from their or its proportionate share of taxes to be levied for state purposes, or due any municipal corporation, nor shall commutation for such taxes be authorized in any form whatever.

A commutation occurs in violation of the Nebraska Constitution when tax funds raised in one district are diverted entirely to the benefit of another district. *State ex rel. School Dist. v. Ellis*, 160 Neb. 400, 70 N.W.2d 320 (1955). Under the provisions of the Nebraska Constitution relating to equality in taxation, laws which impose unfair or unequal burdens of taxation upon one school district for the benefit of another qualify as commutations in violation of the Constitution. *State, ex rel. Groves, v. School District*, 101 Neb. 263, 162 N.W. 640 (1917).

Swanson argues that the common levy of L.B. 839 has the practical and prohibited effect of imposing an "unfair or unequal" burden on him and the other property owners of school district 31 by commuting the taxes of property owners in other school districts. As authority, Swanson relies chiefly on this court's decision in *Peterson v. Hancock*, 155 Neb. 801, 54 N.W.2d 85 (1952). In *Peterson*, this court invalidated a statute imposing a "blanket mill tax levy," which was imposed on all

taxable property in the elementary school districts of a county in addition to the regular school levy. *Id.* at 804, 54 N.W.2d at 88. Only school districts enrolling five or more students were eligible to receive the revenues from that tax. Under the provision of the blanket mill tax levy, most of the revenue raised came from school districts enrolling fewer than five students; those school districts, by virtue of their minimal enrollment, received no benefits of the taxes their property owners paid. The revenues of the blanket mill tax levy were distributed to larger school districts "*solely for their respective local purposes*, . . . thus proportionately [reducing] their regular school district levy." (Emphasis supplied.) *Id.* at 806, 54 N.W.2d at 89.

The *Peterson* court struck down the blanket mill tax levy, finding that

> [t]he only conclusion that can logically be drawn is that districts having less than five pupils are required to pay the blanket levy on all their property into the fund for the sole benefit of districts with five or more pupils. As a result, the regular school district taxes in such districts are thereby released, discharged, or commuted at the expense of districts having less than five pupils, who are required not only to pay the blanket tax levy in full to others *without any benefit to them*, but *also* to pay all regular school taxes required to maintain the school in their own respective districts.

(Emphasis supplied.) *Id.* at 812, 54 N.W.2d at 92.

*Peterson* is inapposite to Swanson's argument because the property owners therein paid two separate and distinct property taxes, established under different statutes for different purposes: one regular school levy to support all school districts in the county, and one blanket mill tax levy to support only districts enrolling at least five students. Swanson attempts to analogize his case to *Peterson* by claiming that he is subject to two property taxes—the tax he paid prior to L.B. 839 and the estimated amount of increase he will incur under L.B. 839. This division, however, creates two taxes in only the most contrived sense. Swanson is subject to one tax, the proceeds of which support both his own district and others within the same Class

VI school system, all of which "feed" into the Valentine High School district. As such, Swanson cannot claim that the common levy supports only a local purpose of districts other than school district 31.

That notwithstanding, Swanson seeks to apply *Peterson* on the grounds that a Class VI school system is not a legitimate taxing district and that, as such, no public benefit exists to redeem the increase in taxes assessed against Swanson to support other Class I districts. In support of this contention, Swanson points to the structural differences between Class I school districts and Class VI school systems. Class I school districts, for example, are independent political subdivisions with a certain degree of statutory autonomy. § 79–401. Each Class I district operates under the direction of a single school board, Neb. Rev. Stat. § 79–102(1) (Reissue 1994); each district holds its own school board elections, Neb. Rev. Stat. § 79–402.09 (Reissue 1994); and each district adopts its own budget, Neb. Rev. Stat. § 13–504 (Cum. Supp. 1994). The boundaries of each Class I district are distinct and separate and are drawn by the county superintendent. Neb. Rev. Stat. § 79–402 (Reissue 1994).

Admittedly, a Class VI school system is distinguishable from a Class I district insofar as the latter lacks those characteristics. However, these characteristics are not dispositive of whether a taxing district exists. Although the Legislature has not statutorily defined a "taxing district," by practical definition the Legislature creates a taxing district when it grants an entity the power to require the county clerk to levy a tax for the support of the district. Neither the federal nor the state Constitution requires an elected or representative board to oversee an assessment or levying process authorized by the Legislature. See *Ratigan v. Davis*, 175 Neb. 416, 122 N.W.2d 12 (1963). The decision of whether to create an elective body to govern a particular taxing district is vested in the discretion and competence of the Legislature. See *id*. That the Legislature declined to create such an elective body does not impair the constitutional legitimacy of a Class VI school system as a taxing district.

Swanson also argues that he should be absolved of the burdens and benefits of schools within the Class VI school system because he has no children in school district 1. This argument is no more effective than an argument that Swanson should pay no property tax at all to support public schools if he has no school–age children. Tax laws, including L.B. 839, represent the Legislature's definition of the measure of every citizen's duty in support of the public burdens. See *State, ex rel. Spelts, v. Rowe*, 108 Neb. 232, 188 N.W. 107 (1922).

*Peterson v. Hancock*, 155 Neb. 801, 54 N.W.2d 85 (1952), outlawed any tax levied for a purpose in which those from whom the taxes are exacted have no interest. Swanson cannot make that claim of L.B. 839. A tax levy does not equal a commutation merely because the taxing district is broadened to reflect the actual benefits to the public. So long as all taxpayers receive the benefit of the taxes they remit, the taxing district passes constitutional muster without offending the prohibition against commutation. *State, ex rel. City of Omaha, v. Board of County Commissioners*, 109 Neb. 35, 189 N.W. 639 (1922).

## UNIFORMITY IN TAX RATES

Swanson's second argument as to how L.B. 839 violates the Constitution of the State of Nebraska is that the common levy results in a nonuniform levy to be assessed against taxable property in school district 31. The prohibition against a nonuniform levy derives from Neb. Const. art. VIII, § 1, as amended in 1992, which states in part: "Taxes shall be levied by valuation uniformly and proportionately upon all real property and franchises as defined by the Legislature except as otherwise provided in or permitted by this Constitution." This provision requires a uniform rate of taxation on all real property and franchises within a taxing district. *State ex rel. Douglas v. State Board of Equalization and Assm't*, 205 Neb. 130, 286 N.W.2d 729 (1979). The parties to this case stipulate that within the Class VI school system, all Class I districts will be taxed at an estimated rate of $1.2096 per $100 assessed valuation under the 1995–96 common levy.

Swanson argues that L.B. 839 violates the uniformity clause, irrespective of the fact that the common levy by its very

definition taxes all Class I districts at the same rate. This argument derives from Swanson's theory that some Class I districts must support through taxes other districts without any return of benefit. This argument is meritless. The amount of the common levy is computed according to the fair value of all property within the Class VI school system. Within and without each Class I district, the common levy affects each property owner in a Class VI school system equally.

Swanson contends that L.B. 839 violates the uniformity clause by indirectly compelling certain property to bear more than its just proportion of the tax requirement. This argument derives from the same reasoning as Swanson's commutation challenge—that is, the district where Swanson's property is located putatively receives no benefit for the revenue in excess of its own property tax requirement. As authority, Swanson cites *State, ex rel. Ahern, v. Walsh*, 31 Neb. 469, 48 N.W. 263 (1891). Although the disputed property tax in *State, ex rel. Ahern,* had been imposed on all property within a school district to support a school general fund, taxes assessed against only railroad-owned property were diverted from the school general fund and used to fund railroad improvements in other districts. That diversion, of course, required the district to tax nonrailroad property at a level to compensate the loss. In diverting part of the total revenue from the school general fund to the support of other taxing districts and then requiring public compensation, the Legislature had compelled the nonrailroad property to bear more than its share of another district's railroad improvements, thereby violating both the commutation and uniformity clauses of the Nebraska Constitution.

*State, ex rel. Ahern,* presented this court with a question quite different from that presented by this case. In *State, ex rel. Ahern,* the lack of uniformity was inherent within one taxing district, wherein some property owners incurred higher rates of taxation than other property owners within the same district in order to support both their own district and a wholly separate district. In this case, the Class I districts in the Class VI school system are part of the same taxing district, and, thus, L.B. 839 does not involve an increased tax imposed on one taxing district

to be diverted to another. Therefore, in enacting L.B. 839, the Legislature has not violated the uniformity clause.

## TAXATION OF REAL PROPERTY
## FOR STATE PURPOSES

Swanson's third argument as to how L.B. 839 violates the Constitution of the State of Nebraska is that it establishes a property tax for state purposes because it requires the use of a common levy for determining the amount of state aid to education to be paid to individual school districts. Neb. Const. art. VIII, § 1A, provides that "[t]he state shall be prohibited from levying a property tax for state purposes." The purpose of this section was to require the state, after the adoption of sales and income taxes, to leave the realm of property taxation. *State ex rel. Western Technical Com. Col. Area v. Tallon*, 196 Neb. 603, 244 N.W.2d 183 (1976) (*Tallon II*). Inherent in the adoption of this section was the idea that the State would continue to carry out its traditional functions and finance them by means other than a property tax. The State cannot, however, avoid or circumvent this constitutional mandate by converting the traditional state functions into local functions supported by property taxes.

Swanson contends that L.B. 839 represents that sort of circumvention of the constitutional mandate. State equalization aid to some districts, including the Valentine Class VI school system, decreases under L.B. 839. Given that school districts may increase their property tax requirements to compensate for that loss, Swanson argues that the Legislature has in effect established a property tax for a state purpose, to expand property tax bases so as to make possible the redistribution of equalization aid.

Authority on this issue comes from the cases of *State ex rel. Western Nebraska Technical Com. Col. Area v. Tallon*, 192 Neb. 201, 219 N.W.2d 454 (1974) (*Tallon I*), and *Tallon II*. *Tallon I* arose under a section of the Nebraska Technical Community College Area Act that provided for the raising of funds in support of the technical community college system by way of a property tax levy. Neb. Rev. Stat. § 79-2626 (Supp. 1973). Under that section, each college area was required to

levy a local property tax and remit the proceeds to the State in order to receive state funding for the area's college. *Tallon I.* This court struck down that section as unconstitutional in light of the prohibition against a property tax for a state purpose. Two years later, *Tallon II* challenged the amended version of the Nebraska Technical Community College Area Act, Neb. Rev. Stat. §§ 79-2636 through 79-2662 (Supp. 1975), which had been drafted to conform with this court's holding in *Tallon I.* This court found that the amended act no longer offended article VIII, § 1A.

Under the original version of the act challenged in *Tallon I,* the State had assumed direct control of all major policy decisions that affected the operation of each of the seven community college areas. *Tallon I.* The State controlled each college's capital expenditures, each college's ability to contract for acquisitions, and the direction of which facilities · and training and curricula were available in the various areas, and directly controlled the individual budgets of each area. These facts "demonstrate the dominance of the State as opposed to the local areas in all major matters of control and operation of the statutory system." *Id.* at 211, 219 N.W.2d at 460.

Additionally, the tuition for a prospective technical community college student depended only on whether that student was a state resident, rather than on whether the student was a resident of the area where he or she wished to attend college. That provision, in complement of the above-listed indicia of control, showed that the statute reflected a legislative purpose to control the operation of all seven community college areas for the benefit of the state as a whole. Herein lies the dispositive inquiry for this case: where state and local purposes are statutorily commingled, this court must determine whether the controlling and predominant purposes of the statute are state purposes or local purposes. *Tallon I.*

*Tallon I* cautions against the possibility of legislative subterfuge, stating that within the prohibition of a property tax levy for state purposes, "where the Legislature has authorized and required local governmental units to make a property tax levy for state purposes, it should not be treated as a local levy for local purposes merely because it is made by a local

governmental unit." *Id.* at 212, 219 N.W.2d at 460. We find no such evidence of subterfuge in L.B. 839. Nothing in L.B. 839 grants to the State control over individual budgets, capital expenditures, availability of programs, whether and how to hire personnel, or administrative rules and regulations. All of these decisions remain within the province of the individual Class I and Class VI school districts.

The statutory scheme in *Tallon II* is more analogous to L.B. 839 than is the statutory scheme in *Tallon I*. In response to *Tallon I*, the Legislature revamped the Nebraska Technical Community College Area Act to create a system that was essentially local in character. The new system did not condition receipt of state funding on the amount of property taxes generated; each college area was a separate and distinct corporate body; each college area was empowered to levy property taxes if it so desired; and each college area decided its own curriculum, personnel, and administrative rules and regulations. *Tallon II*. The state board served in an advisory capacity only and had negligible authority over local college areas. On these facts, the court held that the act was constitutional. These indicia of local control correspond to the Class I and VI school districts, which maintain their autonomy and independence in all respects except their grouping for property tax support.

The mere fact that a state–authorized tax supports a governmental purpose does not render it a tax for state rather than local purposes. *Rock Cty. v. Spire*, 235 Neb. 434, 455 N.W.2d 763 (1990). Even given some commingling of state and local purposes, a statute that requires a political subdivision to levy a property tax does not contravene article VIII, § 1A, so long as the tax is levied for substantially local purposes. *Rock Cty., supra*. The State has assumed neither control nor the primary burden of financial support of Class I districts, nor has the State conditioned state funding on the performance of some act, or the levying of some tax, to benefit the State. Authority from the State to levy a tax does not necessarily translate into a state purpose behind that tax.

## SPECIAL LEGISLATION BENEFITING
## CERTAIN CLASSES

Swanson's fourth argument as to how L.B. 839 violates the Constitution of the State of Nebraska is that the common levy constitutes a special law that solely benefits certain owners of taxable property. Neb. Const. art. III, § 18, prohibits the Legislature from passing local or special laws that grant "to any corporation, association, or individual any special or exclusive privileges, immunity, or franchise whatever. . . . In all other cases where a general law can be made applicable, no special law shall be enacted." When the Legislature confers privileges on a class arbitrarily selected from a large number of persons standing in the same relation to the privileges, without reasonable distinction or substantial difference, then the statute in question has resulted in the kind of improper discrimination prohibited by the Nebraska Constitution. *Haman v. Marsh*, 237 Neb. 699, 467 N.W.2d 836 (1991). A legislative act can violate article III, § 18, in one of two ways: by creating a totally arbitrary and unreasonable method of classification, or by creating a permanently closed class. *Haman, supra.*

Although Swanson does not specify by which of those means L.B. 839 constitutes "special legislation," he appears to assert that L.B. 839 creates an "arbitrary and unreasonable method of classification." Swanson argues that L.B. 839 establishes two classes of taxpayers within every Class VI school system: those who will pay property taxes in excess of the requirements of their Class I and Class VI school districts, and those taxpayers whose districts receive the benefits of the former class' overpayments. This argument fails for the same reason that Swanson's previous arguments of commutation and uniformity fail: because the Class VI school system, and not the individual Class I and Class VI school districts within it, is the taxing district in question.

Swanson also suggests another illegal classification ostensibly created by L.B. 839: those taxpayers located in integrated K–12 districts with a single board of education, and those located in Class I and Class VI districts which have multiple districts and multiple boards of education, but which are tied together for

property tax support purposes. Swanson does not, however, explain how this classification violates article III, § 18.

Even if treated as a claim that L.B. 839 permits taxation without representation, the claim fails. In *Ratigan v. Davis*, 175 Neb. 416, 122 N.W.2d 12 (1963), the plaintiffs lived in a part of the city where they were not entitled to vote for the school board which appointed the regents who governed the city's university, as established under state law. The plaintiffs objected to paying the taxes to support the university levied by the regents on the ground that they were being taxed without representation. In rejecting the plaintiffs' claim, the *Ratigan* court observed that the maxim of government declaring that there should be no "taxation without representation" is not contained in the Constitution and is to be given a very restricted meaning. The court further wrote that the maxim does not mean that "no person can be taxed unless, in the body that determines the amount of the tax to be levied, he is represented by someone for whom he has a right to vote." *Id.* at 419, 122 N.W.2d at 15. Rather, the *Ratigan* court reasoned, "[S]ince plaintiffs were represented in the Legislature that enacted the law . . . they had the representation required by the maxim . . . ." *Id.* at 420, 122 N.W.2d at 15.

Because no unreasonable classification arises from L.B. 839, this law does not contravene the prohibition against special legislation.

Inasmuch as none of Swanson's arguments have merit, we declare L.B. 839 to be constitutional.

JUDGMENT FOR RESPONDENTS.

FAHRNBRUCH, J., concurs.

WRIGHT, J., dissenting.

The purpose of L.B. 839 is to reapportion state aid from one school district to another. Within the Class VI system, which is defined as a Class VI school district and each Class I school district or portion thereof which is a part of the Class VI district, a common levy is set sufficient to generate the aggregate property tax requirements for districts within the system. The tax revenues are then disbursed to each Class I district based on its budgeted tax requirement irrespective of the

amount of tax dollars actually generated from property within that individual district.

State equalization aid to the Valentine Class VI school system decreases under L.B. 839. The reapportionment is accomplished with a Class VI system by using the same mill levy for all the Class I districts within the Class VI system. L.B. 839 therefore requires certain Class I districts to provide financial aid to other Class I districts within the Class VI system. By increasing property taxes to certain Class I districts within the Class VI system, the amount of state aid to the Valentine Class VI system is reduced. Thus, certain Class I districts compensate for such reduction by having an increase in property taxes.

Class I school districts are independent political subdivisions which operate under the direction of elected school boards which adopt the budget for the district. The boundaries are distinct and separate. A Class VI school system lacks these characteristics. When the supporting Class I district has determined its expenditures, it must also support expenditures of other Class I districts. The result is the imposition of an unequal burden of taxation upon one school district for the benefit of another under the disguise of "equal" mill levies. "Under the provisions of our Constitution relating to equality in taxation, any law imposing an unfair or unequal burden of taxation upon one school district for the benefit of another would be unconstitutional." *State, ex rel. Groves, v. School District*, 101 Neb. 263, 264, 162 N.W. 640, 641 (1917). See, also, *High School District v. Lancaster County*, 60 Neb. 147, 82 N.W. 380 (1900). In my opinion, creating the Class VI system imposes an unequal burden of taxation upon one school district for the benefit of another. Under the disguise of an equal mill levy, the Legislature unconstitutionally attempts to do indirectly what it could not do in *Peterson v. Hancock*, 155 Neb. 801, 54 N.W.2d 85 (1952).

"[W]here the Legislature has authorized and required local governmental units to make a property tax levy for state purposes, it should not be treated as a local levy for local purposes merely because it is made by a local governmental unit." *State ex rel. Western Nebraska Technical Com. Col. Area*

*v. Tallon,* 192 Neb. 201, 212, 219 N.W.2d 454, 460 (1974). The creation of a local taxing district does not alter the state purpose of redistribution of state aid.

The use of local property taxes for state purposes is unconstitutional. Article VIII, § 1A, of the Nebraska Constitution provides: "The state shall be prohibited from levying a property tax for state purposes." Where state and local purposes are commingled, the crucial issue turns upon a determination of whether the controlling purposes are state or local. See *Kovarik v. County of Banner,* 192 Neb. 816, 224 N.W.2d 761 (1975).

The obvious purpose of L.B. 839 is to reallocate state aid. This reallocation is possible because property taxes in certain Class I districts are increased to compensate for the redistribution of state aid. I fail to see this as anything but a levy of property tax for state purposes, which is unconstitutional.

CONNOLLY, J., dissenting.

The common levy created by L.B. 839 constitutes a commutation of tax in violation of article VIII, § 4, of the Nebraska Constitution. The constitutional proscription against commuting a tax prevents the Legislature from releasing either persons or property from contributing a proportionate share of tax. *Jaksha v. State,* 241 Neb. 106, 486 N.W.2d 858 (1992). A tax burden lifted from one group of taxpayers must necessarily be shouldered by another group of taxpayers. *Id.* An example of the injustice underlying a commutation of taxes was expressed by William Jennings Bryan at the constitutional convention of 1919–20, "If you will take from one man ten dollars when you should only take five, and then take from some other man only five when you should take ten . . . you simply take five dollars from one man's pocket and put it into another man's pocket." 1 Journal of the Nebraska Constitutional Convention at 310 (1919–1920). The result of the majority opinion is that the taxpayers of district 31 have had their pockets picked.

By consolidating separate school districts into one "system," L.B. 839 causes the "system" as a whole to lose state equalization aid, and places the burden of making up the shortfall on the other separate school districts within the system,

rather than on the districts which experience the loss in equalization aid. This "system" places unequal burdens of taxation upon some Class I districts for the benefit of the other Class I districts. Simply put, L.B. 839 takes $10 from Swanson when he should pay only $5 and gives it to the Class I districts, thereby reducing their contribution and, thus, putting $5 into their pockets.

In the instant case, Swanson's district 31 tax levy for school purposes will increase from 0.6287 per $100 assessed valuation, generating $46,485 to a common levy of 1.2096 per $100 assessed valuation, generating $89,436. The excess $42,951 of property tax revenue generated on property located solely within district 31 will be distributed to other districts within the Valentine Class VI school system to satisfy a portion of their property tax requirements. In dollars, the impact on Swanson's property is that out of a total tax of $465.21, of which $241.80 is required for district 31 and Valentine High School, the excess $223.41 will be distributed to the other districts within the Valentine Class VI school system to assist the other districts. The obvious result is that Swanson's taxes are used to reduce the taxes to be paid by owners of taxable property in the other districts, particularly district 1.

As the majority recognizes, prior to L.B. 839, taxpayers within an unaffiliated Class I district paid tax only for their own Class I district and the Class VI district which students from their Class I district attend. What has changed under L.B. 839 is the additional burden placed upon the taxpayer in an unaffiliated Class I district. Swanson continues to fund his Class I and Class VI districts and must also support the other Class I districts with tax revenue derived from his property, although his property is not located in those districts.

The majority erroneously contends that the whole amount of the common levy must affect solely local purposes of the other Class I districts in order to constitute an unconstitutional commutation of tax. However, this court has held that a law imposing an unfair or unequal burden of taxation upon one school district for the benefit of another is unconstitutional. *State, ex rel. Groves, v. School District*, 101 Neb. 263, 162 N.W. 640 (1917).

By funding district 31's schools and then redistributing the excess property tax revenue to the other Class I districts within the legislatively created system, the majority concludes that the Legislature is within its power to divert the funds because it has created a legitimate "taxing district." Following the tax district concept to its logical conclusion, one could envision a "super taxing district" which could encompass the entire state, and utilize the property tax revenue raised in that "district" to finance expenditures only in Lincoln. The State could argue that the constitutional prohibition against commutation of tax is not violated by arguing that a "benefit" accrues to the entire state because the expenditure takes place in one portion of the taxing district.

Swanson will receive no benefit for his tax dollars. Class I districts adopt their own budgets, conduct their own elections for the Department of Education, and possess separate and distinct boundaries. That portion of Swanson's tax dollar spent within district 31 benefits Swanson, whether he has children in the district or not, partly because Swanson may vote for board members and be represented. However, for that portion of tax paid which exceeds the need of district 31, Swanson receives no benefit. The excess funds will fall under the control of a board of education for which he has no right to cast a vote.

Under L.B. 839, any amount of tax collected by levy against property located in district 31 which exceeds the property tax requirements of district 31 will reduce or have the effect of reducing the tax burden of individuals residing in the other Class I districts which are a part of the artificially created "system." The common levy of L.B. 839 results in a commutation no matter how it is disguised.

WRIGHT, J., joins in this dissent.