CenTra, Inc., a Delaware corporation, et al., Appellants,
v. Chandler Insurance Company, Ltd., a Cayman Islands
corporation, et al., Appellees.

540 N.W.2d 318

Filed December 1, 1995.   No. S-93-964.

Alan E. Peterson and Henry E. Pfeiffer, of Cline, Williams, Wright, Johnson & Oldfather, for appellants.

William M. Lamson, Jr., Michael J. Dugan, and Raymond E. Walden, of Kennedy Holland DeLacy & Svoboda, and Kenneth N. McKinney, Robert L. Roark, and Mary E. Nelson, of McKinney Stringer & Webster, P.C., for appellees Chandler Insurance Co. et al.

Don Stenberg, Attorney General, and Fredrick F. Neid for appellee Nebraska Department of Insurance.

WHITE, C.J., CAPORALE, FAHRNBRUCH, LANPHIER, CONNOLLY, and GERRARD, JJ.

WHITE, C.J.

This appeal from the Lancaster County District Court arises from a corporate takeover battle wherein the Nebraska Department of Insurance (the department) denied the application of the appellant corporations (applicants) to acquire

National American Insurance Company (NAICO). Applicants assign error to two holdings of the district court, which affirmed the decision of the department to deny the application for acquisition. Applicants allege error in the court's refusal to disqualify counsel for Chandler Insurance Company, Ltd., and its subsidiaries, and in the court's refusal to find that the Director of Insurance exceeded his statutory and constitutional authority in requiring applicants to seek department approval before selling or otherwise alienating their Chandler stock. We affirm.

## I. THE PARTIES

CenTra, Inc., is a Delaware corporation whose principal place of business is in Michigan. CenTra is a holding company primarily concerned with motor freight transportation. Its subsidiaries and related entities include Can–Am Investments, Ltd., a Bahamian corporation whose directors are also the directors of CenTra; Ammex, Inc., a Michigan corporation; and DuraRock Underwriters, Ltd., a Barbados corporation and reinsurance company. Ownership and control of each of these entities traces back to one Manuel J. Moroun, an individual who resides in Michigan and who is the president and/or chief executive officer of each of these entities.

NAICO is a Nebraska corporation and a domestic insurer; it is authorized to write property and casualty insurance in Nebraska and 43 other states. NAICO is a wholly owned subsidiary of Chandler (U.S.A.), Inc.; Chandler (U.S.A.), Inc., is an Oklahoma corporation and a wholly owned subsidiary of Chandler Insurance (Barbados), Ltd.; Chandler Insurance (Barbados), Ltd., is a Barbados corporation and a wholly owned subsidiary of Chandler Insurance Company, Ltd., which is a Cayman Islands corporation. The role of Chandler Aviation, Inc., in this litigation is unclear, given that neither party explained either on brief or in oral argument what, if anything, Chandler Aviation did that was relevant to these events. All of these parties (collectively, Chandler) were represented throughout this litigation by the Omaha law. firm of Kennedy Holland DeLacy & Svoboda (Kennedy Holland), whose disqualification from the case applicants seek, alleging several

conflicts of interest.

## II. THE EVENTS

The CenTra–Chandler relationship began in 1987, when NAICO began providing reinsurance to CenTra. Under the reinsurance program (also known as a fronting program), NAICO issued a number of workers' compensation, automobile, and general liability insurance policies to cover CenTra and its affiliates. Those policies were then reinsured through Can–Am Underwriters (a now defunct Moroun entity) and its corporate successor, DuraRock Underwriters, thereby allowing NAICO to spread its risk through a contract of indemnity. See, generally, 19 George J. Couch, Cyclopedia of Insurance Law § 80.2 (rev. 2d ed. 1983). At that time, NAICO was owned and controlled by Chandler Insurance Company, Ltd., which in turn was owned by a number of shareholders.

Prior to 1987, none of Chandler's shareholders held more than 10 percent of its outstanding capital stock. In that same year, however, Moroun concluded that CenTra ought to acquire NAICO so as to maximize its control over both its insurance company and the handling of its own claims. Because NAICO was wholly owned by Chandler Insurance, CenTra launched an effort to acquire Chandler, ultimately acquiring an ownership interest that approximated 22 percent.

That acquisition triggered the scrutiny of the department pursuant to the Insurance Holding Company System Act, Neb. Rev. Stat. §§ 44–2120 to 44–2153 (Reissue 1993) (the Act). (We note that the Act was enacted in 1991, during the course of these transactions, and replaced the previous Neb. Rev. Stat. §§ 44–2101 through 44–2119 (Reissue 1988 & Cum. Supp. 1990). For ease of reference, we use the 1991 version of all statutes cited herein.) Under the Act, "control" of an insurer is presumed to exist if any person, directly or indirectly, owns or otherwise holds 10 percent or more of the voting securities of any other person. § 44–2121(2). The Act further requires that the department must approve the acquisition of control of any domestic insurer. § 44–2126. The approval process requires an applicant to file a "Form A" application for acquisition of control and affords the applicant a hearing before the

department, before the department renders its decision. *Id.* Even despite apparent ownership of an insurer, however, the Act allows an acquiring party to escape department scrutiny by filing a disclaimer of control. § 44–2121(2). CenTra filed such a disclaimer in 1989, and the department approved the disclaimer subject to CenTra's voluntary "Standstill Agreement" to cease its stock purchases.

In 1992, an inside management group of Chandler tried to acquire control of Chandler so as to convert it to a privately held corporation. This attempt was aborted when the management group and applicants failed to reach an agreement on what should be their respective ownership interests in Chandler; the management group ultimately withdrew its tender offer for control of Chandler. In the meantime, CenTra had directed its broker to increase its Chandler holdings by acquiring more Chandler stock from other Chandler stockholders.

Upon learning of CenTra's actions, the department issued a "cease and desist" order to CenTra. CenTra responded by creating a straw corporation, Can–Am Investments, Ltd., whose sole reason for existence apparently was to acquire Chandler stock. Since Can–Am Investments had not been formed at the time of the cease and desist order, applicants argue that Can–Am Investments was not bound by the order and allowed Moroun to continue his acquisition of Chandler stock by way of this new entity. CenTra and Moroun halted their acquisition efforts only after the department issued a second cease and desist order, revised to include Can–Am Investments. By that point, CenTra had acquired 49.2 percent of all issued and outstanding stock of Chandler. Significantly, only after achieving this quantum of ownership did CenTra file its Form A application for acquisition of control; despite that CenTra's disclaimer of control was approved in 1989, the Form A would have become relevant again upon renewal of CenTra's acquisition efforts in 1992.

Following applicants' Form A hearing in September 1992, the department denied applicants' request. The department based its denial of acquisition on criteria enumerated in § 44–2127. In particular, the department found that the financial

condition of applicants could jeopardize the financial stability of the insurer or prejudice its policyholders; that applicants' competence, experience, and integrity were such that their acquisition of the insurer would not be in the policyholders' best interests; and that the acquisition of the insurer was likely to be hazardous to the public. The department's order included a requirement that applicants seek department approval before disposing of their ownership in any manner.

On de novo review of the substantial record in this case, the Lancaster County District Court affirmed both the department's findings and the scope of its order. Applicants appeal from that decision to this court, seeking a remand of their application with instructions to disqualify Kennedy Holland and to limit the scope of any further orders issued by the department.

## III. DISQUALIFICATION OF COUNSEL

Applicants first assign error in the failure by both the department and the district court to find multiple conflicts of interest warranting disqualification of Kennedy Holland from this litigation. Applicants ask this court not only to find that disqualification was proper, but also to find that all proceedings below were inherently erroneous by virtue of Kennedy Holland's representation and, as such, to remand this cause for rehearing without the alleged taint of conflict.

The alleged conflicts arise from three peculiar interactions between Kennedy Holland and the parties to this suit. The first of these interactions was between applicants (in particular, CenTra) and now–Governor E. Benjamin Nelson, who in 1987 worked in an of–counsel relationship for Kennedy Holland. CenTra sought Nelson's advice in 1987 and 1988 as an insurance law expert. Whether Nelson was also retained as an attorney associated with Kennedy Holland is disputed by the parties; notably, despite that applicants' primary argument for disqualification of Kennedy Holland depends on the truth of their allegations concerning Nelson, little discovery was conducted into the allegations. In an affidavit, Nelson states that he reviewed existing and potential insurance agreements with NAICO with an eye toward whether the department would approve those agreements. CenTra also discussed with Nelson

the possibility of nominating him to the NAICO board of directors. CenTra's chief financial officer, Norman Harned, stated in an affidavit that he had told Nelson "about CenTra, the history of our insurance agreements, [and] the reinsurance Can–Am provided to NAICO." Applicants allege no personal impropriety on Nelson's part. Rather, applicants argue that matters reviewed by Nelson for CenTra are substantially related to the matters that now are the subject of Kennedy Holland's representation.

The second interaction applicants cite as grounds for disqualification of Kennedy Holland is that between Chandler and Michael J. Dugan, who is a partner in Kennedy Holland. Applicants allege that Dugan represented the inside management group in its dealings with the department during the management group's 1991 attempt to take control of Chandler and convert it into a privately held corporation. See *Attorney Griev. Comm'n v. Lockhart*, 285 Md. 586, 403 A.2d 1241 (1979) (holding that simultaneous representation of a corporation and of those seeking to purchase its stock is improper).

The third interaction with which applicants find fault is that between Chandler and Dugan, insofar as Dugan served both as a director of Chandler subsidiary NAICO and as a lawyer for Chandler. Applicants argue that Dugan could not properly balance these competing responsibilities. As a lawyer, Dugan owed a duty of loyalty, including acceptance of the corporate client's judgment on interests and objectives, to the corporate entity under Canon 5, EC 5–18, of the Code of Professional Responsibility. As a corporate director, Dugan had to exercise his independent judgment and act in the best interests of the shareholders. See *ConAgra, Inc. v. Cargill, Inc.*, 222 Neb. 136, 382 N.W.2d 576 (1986).

Applicants also call into question whether Dugan, by virtue of his dual roles as director and lawyer, could both uphold his duty to hold inviolate the secrets and confidences of his clients under Canon 4, DR 4–101(B), of the Code of Professional Responsibility and uphold his affirmative duty of disclosure as a corporate director. See *National Credit Union Admin. Bd. v. Regine*, 749 F. Supp. 401 (D.R.I. 1990). Although little

authority supports their contention, applicants claim that the disclosure obligations of a director override the attorney–client privilege. As such, applicants maintain that Dugan's duty as a NAICO director renders him unable to preserve his client's confidences, while his duty as a lawyer for Chandler renders him unable to disclose to other NAICO directors (who include at least one director of CenTra) the material facts he learns in his capacity as an attorney.

This court does not take lightly accusations that a Nebraska law firm has knowingly continued representation where it should withdraw. The courts have a duty to maintain public confidence in the legal system and to protect and enhance the attorney–client relationship in all its dimensions. *U.S., Lord Elec. Co. v. Titan Pacific Const.*, 637 F. Supp. 1556 (W.D. Wash. 1986). The weight of our duty does not diminish in response to the profile of the parties or the amount of money at stake in the litigation, for the appearance of impropriety has an even more pernicious effect when the high stakes of the litigation heighten a lawyer's visibility. See *State ex rel. Creighton Univ. v. Hickman*, 245 Neb. 247, 512 N.W.2d 374 (1994). We are also mindful that disqualification can wreak considerable havoc on a party's efforts to resolve its dispute. At a minimum, the practical effect is that a party must seek and find new counsel; furthermore, a party may be substantially prejudiced because its new attorney must litigate against an opposing counsel who inarguably is more familiar and more facile with the case. See *State ex rel. FirsTier Bank v. Buckley*, 244 Neb. 36, 503 N.W.2d 838 (1993). At the worst, a litigant can use a motion for disqualification as a technique for harassment and delay. *Freeman v. Chicago Musical Instrument Co.*, 689 F.2d 715 (7th Cir. 1982). Thus, we hesitate from the appellate bench to disqualify counsel and "reward a continuing pattern aimed at frustrating adjudication of the case in district court." *U.S., Lord Elec. Co.*, 637 F. Supp. at 1563.

The potential to gain an advantage in litigation through collateral attack cannot be lost on applicants. Applicants have raised no objections to the department's findings on the merits, and yet applicants ask this court to remand this cause for a second bite at the apple versus different opposing counsel.

For two reasons, disposition of applicants' allegations at this final stage in the litigation process is an imperfect remedy for the claimed evils. First, this court accords a good deal of deference to the judgment of the lower court and the administrative tribunal, both of which refused to disqualify Kennedy Holland. After a case has been adjudicated on the merits, we agree with authorities elsewhere who hold that a motion to disqualify an attorney is addressed to the discretion of the trial court, whose findings will not be disturbed absent evidence of abuse. See *Grahams Service Inc. v. Teamsters Local 975*, 700 F.2d 420 (8th Cir. 1982). An attorney disqualification matter is ancillary to the main case, whether the main case is at law, in equity, or is a special proceeding; thus, factual findings in disqualification cases will not be disturbed on appeal if substantial evidence supports those findings. *Killian v. Iowa Dist. Ct. for Linn Cty.*, 452 N.W.2d 426 (Iowa 1990).

Second, at this very late hour, whatever alleged damage was threatened by either Nelson's or Dugan's involvement most likely has been done. An appellate action is an inadequate means of presenting attorney conflicts of interest for review. *State ex rel. Freezer Servs., Inc. v. Mullen*, 235 Neb. 981, 458 N.W.2d 245 (1990). By the time disqualification issues can be presented to an appellate court, any divulgence of confidences will already have occurred, and an appellate court cannot return the parties to the status quo ante. *Id.* Applicants contend that their circumstances merit a draconian remedy from this court— to disqualify counsel and order both the department and the state courts to brace themselves for the consequences of remand of this complex, time–consuming case—despite that applicants raise no objection to the department's findings on the merits of their application. If the circumstances are in fact so exigent, and the potential for injustice is so great, that such an order is warranted, then applicants should have sought from this court a writ of mandamus ordering disqualification much earlier in the litigation. See *id.*

*Baker v. Farnsworth*, 117 Neb. 504, 221 N.W. 17 (1928), appears to require an automatic reversal of the decision of a trial court after an unsuccessful attempt at the trial level to disqualify counsel. However, that case is distinguishable. In *Farnsworth*,

there were errors assigned, possibly meritorious, in addition to the claim of conflict of interest. In this case, no contention is made that the evidence does not support the decision of the department and the district court, and applicants conceded as much at oral argument.

In *Fitzsimmons v. State*, 116 Neb. 440, 218 N.W. 83 (1928), a criminal conviction was reversed where associates appeared for both the prosecution and the defense. We have noted that the standard for determination of whether error in a criminal case requires reversal is whether the error is harmless beyond a reasonable doubt. See *State v. Vogel*, 247 Neb. 209, 526 N.W.2d 80 (1995). Since the conflict could not be demonstrated to meet that standard, the conviction was properly reversed. Obviously, in the civil context of this case, where all parties concede the result is correct, the error may be said to be harmless.

We have held that mandamus is a viable means of addressing perceived attorney conflicts of interest. See, *State ex rel. Creighton Univ. v. Hickman*, 245 Neb. 247, 512 N.W.2d 374 (1994); *State ex rel. FirsTier Bank v. Buckley*, 244 Neb. 36, 503 N.W.2d 838 (1993). Disqualification, upon a showing of conflict of interest, is a clear and absolute ministerial duty which a trial court has no discretion to disregard. See *Buckley, supra*. Given that applicants sat on their rights during the phase of litigation wherein mandamus may have been appropriate, however, this court will not impose that result from appellate review at the costs of greater delay, greater prejudice, and needless waste of judicial resources.

We hold that when an appeal from an order denying disqualification involves issues collateral to the basic controversy, and when an appeal from a judgment dispositive of the entire case would not be likely to protect the client's interests, the party should seek mandamus or other interlocutory review. See *Maddocks v. Ricker; Casson*, 403 Mass. 592, 531 N.E.2d 583 (1988) (addressing guidelines for interlocutory appeals). In this case, any facts found even by virtue of breach of client confidences still will be facts and still will be available as evidence on remand. They will be no less facts merely because applicants' counsel might be more cagey

on their second try. This court will not commit judicial resources to applicants' hope that relitigation against new opposing counsel yields improved results.

## IV. SCOPE OF REMEDY

In its order denying applicants' Form A application, the department restricted applicants' ability to dispose of their stock in Chandler. Applicants must seek department approval before selling or transferring any of their Chandler stock to any other person. Discontented with this restriction, applicants argue that in issuing this order, the director has exceeded the authority granted him by the Nebraska Revised Statutes and by the federal Constitution.

### 1. STATUTORY AUTHORITY

An administrative body such as the department has only that authority specifically conferred upon it by statute or by construction necessary to achieve the purpose of the relevant act. See *In re Application A–16642*, 236 Neb. 671, 463 N.W.2d 591 (1990). An agency must administer a statute in accordance with the standards prescribed in the statute and may not exceed those standards. *NAPE v. Game & Parks Comm.*, 220 Neb. 883, 374 N.W.2d 46 (1985). On review, an appellate court determines the meaning of a statute independently of the determination made by an administrative agency. *In re Application A–16642, supra*. However, this court accords deference to an agency's interpretation of its own regulations unless that interpretation is plainly erroneous or inconsistent. *In re Application of Jantzen*, 245 Neb. 81, 511 N.W.2d 504 (1994). As no particular statute of the Act expressly provides for a restriction on sale of securities, our question is whether the Act provides for such a restriction by implication.

Because of the significant public interest in a well–regulated insurance industry, the Legislature has granted to the department general supervision, control, and regulation of insurance companies, associations, and societies and the business of insurance in Nebraska. See Neb. Rev. Stat. § 44–101.01 (Reissue 1993). The Legislature further granted to the director of the department statutory power to perform all acts the department has the power and authority to do. See *id*.

Notably, in two separate provisions, the Act specifically reserves implied powers not enumerated in the Act for the department and its director. See §§ 44–2139 (allowing the director to "issue such orders as necessary" to carry out the Act) and 44–2153 (providing that enumerated powers and remedies in the Act shall be in addition to and not in limitation of any other powers and remedies provided by law).

In construing a statute, a court must look to the statutory objective to be accomplished, the evils and mischiefs sought to be remedied, and the purpose to be served, and then must place on the statute a reasonable or liberal construction that best achieves the statute's purpose, rather than a construction that defeats the statutory purpose. *Rosnick v. Marks*, 218 Neb. 499, 357 N.W.2d 186 (1984). The district court in this case found that the purpose of the Act is "to protect the policy holders by probing the competence of those seeking to control insurance companies." We agree with this finding. It is the department's responsibility, and not this court's, to manage and oversee the regulation of insurers and the protection of policyholders in Nebraska, and the department must have powers adequate to carry out that responsibility. See *Clark v. Lincoln Liberty Life Ins. Co.*, 139 Neb. 65, 296 N.W. 449 (1941).

With respect to the "evils and mischiefs sought to be remedied," the Director of Insurance was presented with both a unique risk that NAICO policyholders could be subjected to needless prejudice by virtue of CenTra's acquisition and a unique opportunity to protect those policyholders. Moroun's entities—including DuraRock Underwriters and its corporate predecessor, Can–Am Underwriters—have a history of difficulties in obtaining clean audits because of consistent undercapitalization, undercollateralization, and underreserving. Moroun's stock remedy for borderline insolvency seems to be liquidation of existing, underreserved entities and creation of new entities whose only "assets" are unsecured notes and debentures drawn from other Moroun entities. The values of those debentures tend to be generously and suspiciously magnified. Consequently, DuraRock Underwriters and its predecessor, Can–Am Underwriters, have come under—and failed to survive—scrutiny of insurance regulators in Barbados.

James Adler, an expert accountant who testified for Chandler, stated that CenTra is "highly ill–liquid," that CenTra was experiencing severe cash–flow problems, and that Moroun uses his companies as his personal bank account. The director was thus legitimately concerned about how best to prevent such business practices from creeping into the operation of a Nebraska domestic insurer.

Beyond the problems experienced by and caused by Moroun entities in the past, however, the conduct of those entities in this litigation triggers legitimate concern that the only way for the department to protect NAICO policyholders is to retain jurisdiction over this matter and monitor applicants' disposition of their Chandler stock. No party may acquire statutory control of an insurer without department approval, and yet applicants boldly disregarded this very clear prohibition by amassing nearly five times that amount of stock specified for statutory control. That applicants broke the law is so clear that applicants do not even raise an objection to that finding. Even when the director issued his first cease and desist order, applicants unhesitatingly circumvented the order by creating a sham corporation, pausing not even long enough to explain to the sham corporation's new directors what its purpose would be. The deposition testimony of Robert Berquist, a director of Can–Am Investments since its inception, is telling as to the motive for creating Can–Am: Berquist did not know what securities Can–Am would invest in; nor when or where Can–Am was incorporated; nor whether Can–Am had any assets or liabilities; nor, for that matter, whether Can–Am had any articles, bylaws, financial information, or minutes of meetings. This testimony cuts against applicants' denial that the creation of Can–Am was a sidestep of department orders.

Copious evidence supports the director's conclusion that the remedies expressly provided in the Act would not eliminate the policyholders' exposure to hazard and prejudice. Applicants' unapologetic disregard for Nebraska law raises the specter of future disregard for the interests of NAICO policyholders. Accordingly, we find that the director should not be impeded in his choices of remedy and protective measures by the enumerated powers of the Act. See *Workman v. Great Plains*

*Ins. Co., Inc.*, 189 Neb. 22, 200 N.W.2d 8 (1972) (holding that public policy as to insurance may be expressed and enforced by department through exercise of its powers under statutes). The importance of the director's duties as a watchdog for policyholders, and the fact that the director is the only watchdog whose authority can bind applicants, counsel in favor of a broad construction of the Act and the remedies provided therein. Pursuant to the grants of plenary authority contained in §§ 44-2139 and 44-2153, the director may issue the necessary protective orders until policyholders' interests are no longer jeopardized by outlaw corporate raiders.

## 2. CONSTITUTIONAL AUTHORITY

Having concluded that the director acted within his statutorily granted authority, we turn next to applicants' contention that the order violates the Commerce Clause of the federal Constitution. Applicants claim that either under an insurance–specific analysis of the Commerce Clause or under an all–purpose Commerce Clause analysis, the director has impermissibly burdened interstate commerce by restricting the activities not exempted from Commerce Clause scrutiny.

Whether a statute is unconstitutional is a question of law. *State ex rel. Dept. of Health v. Jeffrey*, 247 Neb. 100, 525 N.W.2d 193 (1994). Accordingly, this court is obligated to reach a conclusion independent of the decision reached by the trial court. *Id.* The unconstitutionality of a statute must be clearly demonstrated before this court can declare the statute unconstitutional, and all reasonable doubts will be resolved in favor of its constitutionality. *Henry v. Rockey*, 246 Neb. 398, 518 N.W.2d 658 (1994). Even when a law may be constitutionally suspect, a court will attempt to interpret it in a manner consistent with the Constitution. *Bamford v. Upper Republican Nat. Resources Dist.*, 245 Neb. 299, 512 N.W.2d 642 (1994). As applicants attack an order issued pursuant to the Act, and as we have held that the order was issued within the authority granted by the Act, we will examine the constitutional validity of the order as if it were a statutory part of the Act. See *Stratbucker Children's Trust v. Zoning Bd. of Appeals*, 243 Neb. 68, 497 N.W.2d 671 (1993).

### (a) The McCarran–Ferguson Act

Article I, § 8, of the U.S. Constitution grants Congress the power to regulate commerce among the states. Contained within that grant of power to the federal government is an implicit limitation on the power of the states to interfere with or impose burdens on interstate commerce. *Edgar v. MITE Corp.*, 457 U.S. 624, 102 S. Ct. 2629, 73 L. Ed. 2d 269 (1982). If Congress expressly authorizes the states to regulate an area of interstate commerce, however, any action taken by the state within that authorization will be invulnerable to Commerce Clause challenge. *Western & Southern L. I. Co. v. Bd. of Equalization*, 451 U.S. 648, 101 S. Ct. 2070, 68 L. Ed. 2d 514 (1981). Relevant to this case is the authorization Congress granted with respect to the states' regulation of insurance companies domiciled within their boundaries by enacting the McCarran–Ferguson Act (MFA). 15 U.S.C. § 1011 et seq. (1994). The MFA permits states to regulate insurance companies within their boundaries and removes all Commerce Clause limitations upon that authority. See *Western & Southern L. I. Co., supra.*

Even the auspices of the MFA, however, do not exempt all state regulation of the activities of insurers. *SEC v. National Securities, Inc.*, 393 U.S. 453, 89 S. Ct. 564, 21 L. Ed. 2d 668 (1969). Rather, the MFA grants states authority to regulate insurers only to the extent that state law governs "the business of insurance." *Id*. See, also, 15 U.S.C. § 1012(a) and (b). Herein lies the critical inquiry: whether a restriction on the sale of stock in a domestic insurer is sufficiently connected to "the business of insurance" to be shielded by the MFA from Commerce Clause attack. Applicants argue that this restriction intrudes impermissibly into the federal realm of securities regulation.

The U.S. Supreme Court has reduced the inquiry of whether a practice is part of "the business of insurance" to a three-part test: (1) The practice must relate to the transferring and spreading of risk, (2) the practice must be an integral part of the policy relationship between the insurer and the insured, and (3) the practice must be limited to entities within the insurance industry. *Union Labor Life Ins. Co. v. Pireno*, 458 U.S. 119,

102 S. Ct. 3002, 73 L. Ed. 2d 647 (1982). As applied to the Act and orders issued pursuant to the Act, these criteria support our finding that the director's order does relate to "the business of insurance."

First, the restriction on stock disposition relates, albeit indirectly, to the transferring and spreading of risk. The Act and its implied powers are triggered only when a person who makes a tender offer for voting securities of a domestic insurer would acquire control of that domestic insurer. See § 44–2126. The Act affords the Director of Insurance a chance to review the financial stability of the acquiring company so that he can determine whether acquisition is in the best interests of Nebraska policyholders. See *id*. See, also, *Hoylake Investments Ltd. v. Gallinger*, 722 F. Supp. 573 (D. Ariz. 1989). The director is further afforded, by virtue of §§ 44–2139 and 44–2153, the opportunity to bring any threatened change of control under his own control so that he can consider the impact of such a change on policyholders. See *Gallinger, supra*.

Whether a domestic insurer will remain reliable to its policyholders certainly relates to the transferring and spreading of risk. In this case, the director is justifiably concerned that the stock will be transferred to more Moroun entities, legitimate or otherwise, thereby prejudicing the interests of policyholders. Notably, in states with laws similar or identical to those composing the Act, courts have found that such laws do relate to the transferring and spreading of risk. See, *Gallinger, supra* (Arizona law); *Hoylake Investments Ltd. v. Bell*, 723 F. Supp. 576 (D. Kan. 1989) (Kansas law); *Hoylake Investments Ltd. v. Washburn*, 723 F. Supp. 42 (N.D. Ill. 1989) (Illinois law). Those courts reasoned that because a change of control of an insurer can affect the quality and stability of policies, these laws satisfy the requirement that they related to the transferring and spreading of risk. The same is true for the Nebraska Act and for orders issued pursuant to the Act.

The second criterion of "the business of insurance" is that the regulated practice must be an integral part of the policy relationship between the insurer and its insured. *Pireno, supra*. The Nebraska Act satisfies this criterion as well. The review and evaluation by the director involves the relationship between

an insurance company and its policyholders. Cf. *Alleghany Corp. v. Pomeroy*, 700 F. Supp. 460 (D.N.D. 1988), *rev'd on other grounds* 898 F.2d 1314 (8th Cir. 1990) (stating that policyholder is concerned only with whether claim will be paid, not with who controls direction of company). Unfortunately, the individual policyholder is not in a position to understand the ramifications of a change of control in his insurer until the insurer becomes insolvent and unable to pay claims. The director has both the ability and the statutory responsibility to ensure that the relationship between the insurer and the policyholder is one of mutual understanding and not one of deceit. See, *Bell, supra*; *Washburn, supra*.

The third criterion of "the business of insurance" requires that the regulation be limited to entities within the insurance industry. This criterion is also satisfied. It is true that the Act affects not only policyholders, but also investors and stockholders who seek to own stock in Nebraska domestic insurers. See *Alleghany Corp., supra*. We further recognize that the Act restricts the ability of an out-of-state stockholder to sell his interest to a willing purchaser whenever the sale would result in the purchaser's owning more than 10 percent of the domestic insurer. See *id*. The focus of all of these restrictions, however, remains the interest of the individual policyholder.

Irrespective of what sort of concern pursues ownership and control, the Act concerns itself solely with the acquisition of domestic insurance companies. See *Washburn, supra*. This is not an instance of the department reaching out to invade the stock market. Rather, it was applicants who wished to control the handling of CenTra's insurance claims; it was applicants who sought to gain control of their insurer by owning its stock; and it was applicants who chose to cast into jeopardy the one policy concern for whose protection the department was created: that an insurer should remain as reliable as it promises its insureds it will be. The director has not intruded into securities regulation. If anything, it is applicants who have intruded impermissibly into insurance regulation. The Act affects entities outside the insurance industry only insofar as those entities choose to enter this rightly regulated arena.

Applicants assert that *SEC v. National Securities, Inc.*, 393

U.S. 453, 89 S. Ct. 564, 21 L. Ed. 2d 668 (1969), supports their contention that the director's order transgresses the regulation of "the business of insurance." In *National Securities, Inc.*, the U.S. Supreme Court invalidated a portion of the Arizona version of the Act, a body of law substantially similar to the Nebraska Act. The portion in question required the director to find that a merger of insurers would not substantially reduce the services to be rendered to policyholders. The Court concluded that regulation whose focus is the protection of stockholders does not sufficiently relate to the MFA to be shielded from Commerce Clause attack.

In contrast to the facts of *National Securities, Inc.*, the provisions questioned in this case protect not stockholders, but policyholders. No part of the Nebraska Act is concerned with security of or services rendered to stockholders; whether merger or acquisition is equitable to stockholders is immaterial in the eyes of the director. Significantly, however, the *National Securities, Inc.*, Court found that the section of the Arizona act that empowered the director to determine whether acquisition would substantially reduce the security of *policyholders'* interests "clearly relates to the 'business of insurance.'" 393 U.S. at 462. This holding of *National Securities, Inc.*, and not the holding pertaining to stockholders, controls our disposition of the Act's conformity with the MFA.

Policyholders' interests can come under attack from many fronts, including manipulation of ownership and control by individuals to whom an insurer's solvency is a negligible priority. In his concurrence to *S. E. C. v. Variable Annuity Co.*, 359 U.S. 65, 90–91, 79 S. Ct. 618, 3 L. Ed. 2d 640 (1959), Justice Brennan wrote that "[t]he prevention of insolvency and the maintenance of 'sound' financial condition in terms of fixed–dollar obligations is precisely what traditional state regulation [of insurance] is aimed at." We agree, and accordingly we hold that the Nebraska Act and the director's order relate to "the business of insurance" and thereby qualify for the protection of the MFA against a Commerce Clause challenge.

### (b) Commerce Clause Analysis Under
### *Pike v. Bruce Church, Inc.*

Finally, applicants argue that even if the MFA applies, the director's order violates the Commerce Clause under the balancing test articulated in *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 90 S. Ct. 844, 25 L. Ed. 2d 174 (1970). The general rule arising from *Pike* states that

> [w]here the statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. [Citation omitted.] If a legitimate local purpose is found, then . . . the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities. Occasionally the Court has candidly undertaken a balancing approach in resolving these issues [citation omitted], but more frequently it has spoken in terms of "direct" and "indirect" effects and burdens.

397 U.S. at 142. See, also, *Heath Consultants v. Precision Instruments*, 247 Neb. 267, 527 N.W.2d 596 (1995) (applying *Pike* balancing test).

The U.S. Supreme Court applied its *Pike* analysis in *Edgar v. MITE Corp.*, 457 U.S. 624, 102 S. Ct. 2629, 73 L. Ed. 2d 269 (1982), finding that the Illinois Business Take–Over Act directly regulated transactions that take place wholly outside the State of Illinois. Because the statute prevented offerors from conducting interstate transactions with stockholders both within the State of Illinois and in foreign states bearing no relation to Illinois, the Court found that statute to be a direct restraint on interstate commerce with an impermissibly sweeping extraterritorial effect. Significantly, however, neither the Nebraska Act nor the director's order has by its terms such extraterritorial reach. The mere fact that the burden of a state regulation falls on some interstate companies does not, by itself, establish a claim of discrimination against interstate commerce. *Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 98 S. Ct. 2207, 57 L. Ed. 2d 91 (1978).

We find stronger authority for analysis of the Nebraska Act in the case *CTS Corp. v. Dynamics Corp. of America*, 481 U.S. 69, 107 S. Ct. 1637, 95 L. Ed. 2d 67 (1987). In *CTS Corp.*, the U.S. Supreme Court upheld an Indiana takeover statute against a Commerce Clause challenge. The Indiana statute protected shareholders of Indiana corporations by placing certain obstacles in the path of any party making a hostile tender offer for those shares. The respondent alleged unconstitutional interference with interstate commerce. In rejecting this Commerce Clause attack, the *CTS Corp.* Court stated that the act did not prohibit any entity of any state from attempting to gain control of an Indiana corporation: "It only provides regulatory procedures designed for the better protection of the corporations' shareholders." 481 U.S. at 93.

The Nebraska Act does not have the reach of the invalidated statute of *MITE Corp.* The Act applies equally, regardless of whether the would-be acquiring party is a Nebraska resident. As such, the Act does not resemble the " 'principal objects of dormant Commerce Clause scrutiny,' " which are statutes that discriminate against interstate commerce. See *Hoylake Investments Ltd. v. Washburn*, 723 F. Supp. 42, 47 (N.D. Ill. 1989). The Act, further, poses no threat of inconsistent regulations, since it regulates only the internal affairs of insurers registered in Nebraska. See *id.* The local purpose of protecting Nebraska policyholders is legitimate and qualifies as a valid use of police power. See *State ex rel. Neff v. Christian Brotherhood of America Burial Assn.*, 186 Neb. 525, 184 N.W.2d 643 (1971). Moreover, the order is not an outright prohibition of stock sales by applicants, but only a prior-approval requirement: the order impedes applicants from nothing except skating around department authority. The scales thus tip in favor of the legitimate local purpose when balanced against the incidental effects on commerce.

In issuing the prior-notice restriction, the director of the department did not exceed the authority granted him under the Act. The director, furthermore, acted within the confines of the Commerce Clause, applying either the MFA analysis or the *Pike* balancing test. Applicants' second assignment of error fails.

## V. CONCLUSION

Because applicants' request to disqualify counsel is irredeemably late, and because the director acted within the scope of his statutory and constitutional authority, we affirm the holdings of the Lancaster County District Court.

AFFIRMED.

WRIGHT, J., not participating.