REQUESTED BY: Lori McClurg, Director Department of Administrative Services
This is in response to the questions you have asked relating to the authority of the Vacant Building and Excess Land Committee ("Committee") to approve the grant of a utility easement to a private corporation to install underground fiber optic lines on state-owned real property. Two specific questions are asked. FIRST, "[w]ould the definition of a utility apply to the fiber optic lines being proposed?" SECOND, "[c]an the State Board of Agriculture be considered a political subdivision that is applying for this easement, or can Level 3 Communications Corporation be considered their contractor as provided in the above statutory citation?" The questions are posed in the context of Neb. Rev. Stat. § 72-818 (1996) which provides for the authority of the Committee to approve utility easements on state-owned property.
It is our opinion that the Committee does not have authority to approve the request of the State Board of Agriculture to grant an easement to a private corporation for construction of fiber optic lines across state-owned real property.
 I. BACKGROUND
The Nebraska State Board of Agriculture ("Fair Board") has submitted a request for the granting of an easement to a private company, Level 3 Communications Corporation, for installation of an underground fiber optics line to facilitate construction of a national communications network. The real property is owned by the State of Nebraska and is commonly known as the Nebraska State Fairgrounds. The easement proposal has been submitted to the Committee for purposes of approving the granting of an easement. If approved, the Department of Administrative Services executes conveyance of the easement and has responsibility for implementation of the easement.
 II. STATUTORY AUTHORITY
The Committee is an administrative body of state government established by statute to declare buildings or land of the state to be vacant or excess under the provisions of Neb. Rev. Stat. §§72-811 to 72-818 (1996 and Cum. Supp. 1998). The duties of the Committee also include considering requests for approving the granting of utility easements on state-owned real property to political subdivisions. Neb. Rev. Stat. § 72-818 (1996) states:
 A state agency may submit a request for granting a utility easement on state-owned land to the committee. The committee may approve utility easements by majority vote. Utility easements may only be granted to political subdivisions or their contractors for utility or construction-related purposes. The committee shall certify the approval of a utility easement to the Director of Administrative Services who shall execute the instrument necessary to grant the easement. The state building division of the Department of Administrative Services shall be responsible for the implementation of easements granted under this section.
(Emphasis added).
The point of inquiry is to determine whether the request for approval of the easement falls within the scope of authority of the Committee. Administrative bodies have only that authority conferred upon them by statute or by construction necessary to achieve the purpose of the relevant act. Southeast Rural Vol.Fire Dept. v. Dept. of Revenue, 251 Neb. 852, 560 N.W.2d 436
(1997); Centra, Inc. v. Chandler Insurance Co., Ltd.,248 Neb. 844, 540 N.W.2d 318 (1995). Accordingly, it is necessary to review the language of § 72-818 and the status of the Fair Board to ascertain whether the Committee is authorized to approve an easement to be granted to the Fair Board or the private corporation.
A. Nature of the Requested Easement.
In answer to your first question, we believe that the fiber optics line to be installed for completion of a communications network would come within the definition of the term, "utility," as that term is commonly understood to mean. While the term is not defined in § 72-818, it is defined in other Nebraska statutes. Neb. Rev. Stat. § 69-1302(h) defines the term to mean, ". . . any person who owns or operates within this state, for public use, any plant, equipment, property, franchise, or license for the transmission of communications or the production, storage, transmission, sale, delivery, or furnishing of electricity, water, steam or gas." This definition is consistent with other commonly accepted definitions of the term. Webster's Unabridged Dictionary (2d Ed.) includes the definition of the word, "utility", to mean something useful to the public, especially the service of electric power, gas, water, telephone, etc., and a company providing such service.
It is an elementary rule of statutory construction that courts determine and give effect to the legislature's purpose and intent as ascertained from the entire language of the statute considered in its plain, ordinary and popular sense. Nickel v.Saline County School dist. No. 163, 251 Neb. 762, 559 N.W.2d 480
(1997); Southern Nebraska Rural Public Power Dist. v. NebraskaElect. Generation and Transmission Co-op, Inc., 249 Neb. 913,546 N.W.2d 315 (1996). In applying this tenet of construction, we conclude that installation of fiber optics transmission lines for completion of a communications network would come within the meaning of the term, "utility," considered in its ordinary and popular sense.
B. Status of the State Board of Agriculture.
The focus of your second question relates to whether the Fair Board is a political subdivision and whether Level 3 Communications Corporation is appropriately considered as the contractor for a political subdivision. The request for approval of the easement is appropriately considered only if the Fair Board is a political subdivision since utility easements may only be granted to political subdivisions or their contractors under the provisions § 72-818.
The Nebraska Supreme Court has considered questions whether entities having certain attributes of governmental and public purposes are political subdivisions for purposes of the Political Subdivisions Tort Claims Act, Neb. Rev. Stat. § 13-901 to 13-926
(1997). In Parriott v. Drainage District No. 6, 226 Neb. 123,410 N.W.2d 97 (1987), it was observed that a drainage district is a body corporate and politic with the statutory authority to levy taxes and with the power of eminent domain. The court concluded that drainage districts are political subdivisions for purposes of the Political Subdivisions Tort Claims Act. For the same reasons, an irrigation district properly organized was held by the court to be a political subdivision. See i.e. Peterson v. Gering Irr.Dist., 219 Neb. 281, 363 N.W.2d 145 (1985).
Determining factors in considering whether a particular entity constitutes a political subdivision include taxing authority and fixed geographic boundaries. The court, in Cataniav. The University of Nebraska, 204 Neb. 304, 282 N.W.2d 27 (1979), viewed a political subdivision as a body which contemplates geographical area and boundaries, public elections, taxing power, and a general purpose or benefit. In Catania, the court reviewed the question whether the University of Nebraska was a political subdivision of the state. In concluding that the University was not a political subdivision, the court stated:
 The University is statewide in its service, has no geographical limitations in the boundary sense of the word, and has no power to levy taxes. It is completely dependent, initially at least, on the appropriations made by the legislature, as are all state agencies.
Id. At 308, 309, 282 N.W.2d at 30. (Emphasis added).
The organizational statutes of the Fair Board do not provide for the power to levy taxes. Rather, funding sources include revenue and earnings from the operations of the grandstand, related facilities, and the Nebraska Fairgrounds. See Neb. Rev. Stat. § 2-115 (1997). The Fair Board relies on appropriations, at least in part, to pay costs associated with the use of the grandstand, racetrack and associated facilities under the provisions of Neb. Rev. Stat. §§ 2-127 and 2-128 (1997).
It seems to us that the Fair Board lacks the essential elements of a political subdivision. The Board has no fixed geographical limits in that it is statewide in its service and has no power to levy taxes. The related part of your second question is whether Level 3 Communications Corporation may be considered as a contractor of a political subdivision. Since it is our view that the Fair Board is not a political subdivision of the state, the corporation cannot be viewed as the contractor of a political subdivision.
Authority is further lacking for approving the easement because § 72-818 authorizes the Committee to consider the request of a state agency for approval of a utility easement. The Nebraska Supreme Court has reviewed the questions whether the Fair Board constitutes a state agency or other public entity on two occasions. In Crete Mills v. Nebraska State Board ofAgriculture, 132 Neb. 244, 271 N.W. 684 (1937), the court held that the Fair Board was not an executive agency of the state. In reaching the conclusion that the Board is essentially a private corporation, the court observed that the statutory intent evidenced by the enactments removed the Board from consideration as an executive agency of the state. In so concluding the court noted:
 Since 1858 it has consistently operated independently, and as removed from executive control and direction. It cannot be considered as an independent department of government. Section 1, art. IV of the Constitution provides: "The heads of all executive departments established by law other than those to be elected as provided herein, shall be appointed by the governor, with the consent of the legislature. So, too, the record discloses that the corporation in suit collects its receipts from admissions to fairs, and from charges against concessions, and from other like sources of income, and pays out and disburses the same by and through its own officers as a private corporation."
Id. At 250, 271 N.W. at 687. (Emphasis added).
More recently, the Nebraska Supreme Court held that the Fair Board, while operating pari-mutuel betting, was a business association and not a public corporation for purposes of the Uniform Disposition of Unclaimed Properly Act, Neb. Rev. Stat. §§69-1301 to 69-1329 (1996 and Cum. Supp. 1998). See State ex rel.Marsh v. State Bd. Of Agric., 217 Neb. 622, 350 N.W.2d 535 (1984).
 III. LEGISLATIVE HISTORY
To the extent that § 72-818 is unclear, the legislative history may be examined to ascertain the Legislature's intent with respect to the statutory provision. Southern Nebraska RuralPublic Power Dist. v. Nebraska Elec. Generation and TransmissionCo-op, Inc., 249 Neb. 913, 546 N.W.2d 315 (1996); Omaha PublicPower Dist. v. Nebraska Dept. of Revenue, 248 Neb. 518,537 N.W.2d 312 (1995). As a result, the legislative history of LB 567 (Laws 1995) has been reviewed to ascertain legislative intent with respect to the Committee's authority to approve utility easements over state-owned land.
The legislative history supports the conclusion that the Committee is authorized to approve the granting of utility easements only to political subdivisions or their contractors. The Legislative Committee's records include the following statement of purpose for LB 567:
 LB 567 is intended to clarify which branch of government is responsible for granting utility easements for state-owned land. Though there is no statutory requirement for the Legislature to grant such easements, it has been customary to obtain legislative approval before allowing such easements on state-owned land. LB 567 authorizes the Vacant Building and Excess Land Committee to approve, by majority vote of its members, utility easements. Such easements may be granted only to political subdivisions or their contractors for utility or construction related purposes. The Director of Administrative Services is authorized to execute the instrument necessary to grant the easement, and the Department of Administrative Services is responsible for implementing easements thus granted.
Committee Records on LB 567 (Laws 1995), 94th Neb. Leg., 1st
Sess., Introducer's Statement of Intent. (Emphasis added).
Portions of the testimony at the committee hearing are also instructive and reflect that a purpose of the bill was to grant utility easements on state-owned property controlled by state agencies. Testimony at the hearing on February 10, 1995, includes the following statement:
 This bill would authorize the Vacant Building and Excess Land Committee to grant utility easements for state property controlled by various state agencies. As with the disposal of state property prior to 1988, agencies are currently in the position of having to get specific legislation introduced and passed to grant utility easements on real property they control. In almost all cases, these utility easements are with other political subdivisions.
Committee Records on LB 567 (Laws 1995), 94th Neb. Leg., 1st
Sess. 38 (February 10, 1995) (Statement of Ken Fougeron, Administrator, Building Division, Department of Administrative Services). (Emphasis added).
 IV. SUMMARY
The Nebraska Supreme Court has determined that the Fair Board is neither a political subdivision nor an executive agency of the state. Accordingly, the Fair Board is without standing to request that the Committee approve the granting of a utility easement to the Board. The language of § 72-818 requires that utility easements be granted to political subdivisions or their contractors. It is necessarily our conclusion that the Committee is without authority to approve the easement since the fair board is not a political subdivision and Level 3 Communications Corporation is not the contractor of a political subdivision.
As the legislative history instructs, it was necessary for state agencies to obtain legislative authorization to grant utility easements on state-owned property prior to passage of LB 567. The provisions of LB 567 (codified at § 72-818) do not authorize the granting of utility easements to private companies. For this reason, it is necessary that legislative authorization be obtained for the granting of the easement to a private company.
Sincerely,
 DON STENBERG Attorney General
 Fredrick F. Neid Assistant Attorney General
Approved:
DON STENBERG
Attorney General
21-128-16