745 N.W.2d 578 (2008)
275 Neb. 211
Roy T. HOLMES, Individually, and Patricia G. Holmes, Conservator of the Estate of Roy T. Holmes, a Protected Person, Appellees,
v.
STATE of Nebraska DEPARTMENT OF HEALTH AND HUMAN SERVICES and Nancy Montanez, Director of the Nebraska Department of Health and Human Services, Appellants.
No. S-06-1141.
Supreme Court of Nebraska.
March 7, 2008.
*580 Jon Bruning, Attorney General, John L. Jelkin, and, on brief, Douglas D. Dexter for appellants.
Joseph C. Byam, of Byam & Hoarty, for appellees.
HEAVICAN, C.J., and WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.
WRIGHT, J.

NATURE OF CASE
This case involves the determination of a patient's ability to pay for mental health care provided by the Nebraska Department of Health and Human Services (DHHS). The issue is whether DHHS properly determined Roy T. Holmes' ability to pay for his care.

SCOPE OF REVIEW
A judgment or final order rendered by a district court in a judicial review pursuant to the Administrative Procedure Act may be reversed, vacated, or modified by an appellate court for errors appearing on the record. When reviewing an order of a district court under the Administrative Procedure Act for errors appearing on the record, the inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable. Belle Terrace v. State, 274 Neb. 612, 742 N.W.2d 237 (2007).

FACTS
Holmes received inpatient treatment at the Norfolk Regional Center (NRC) from December 3, 2003, to April 21, 2004. He also received outpatient treatment at the NRC from May 4, 2004, to July 7, 2005.
On February 17, 2004, DHHS notified Patricia G. Holmes (Patricia), Holmes' mother and conservator, by letter that it had determined that Holmes was able to pay for his care at the NRC. DHHS informed Patricia that for each month Holmes was in treatment, she was obligated to pay Holmes' Social Security benefits ($1,071 in 2003; $1,087 in 2004), less a $50 personal, needs allowance, plus 2 percent of his chargeable assets (which DHHS calculated to be $1,078) for the cost of his treatment at the NRC. DHHS determined Holmes' chargeable assets by deducting his credit card balance of $1,200 and his dependent deduction of $4,000 from the assessed value of his home, which was $59,100. Based on those calculations, Holmes' total chargeable assets were $53,900. DHHS determined that Holmes' "total ability to pay" for his care was $2,099 effective December 3, 2003, and $2,115 effective January 1, 2004, for each following month.
Patricia filed a "Written Appeal and Request for Hearing" with DHHS. She argued that DHHS' action against Holmes' Social Security benefits was barred by federal law and that she had no obligation to pay the Social Security benefits to DHHS.
*581 At an administrative hearing on January 10, 2006, DHHS offered into evidence exhibit 22, a revised determination of Holmes' ability to pay for his inpatient care, as well as DHHS' determination of Holmes' ability to pay for his outpatient care. DHHS' revised determination included the mortgage on Holmes' house as a liability, which changed his total liabilities from $1,200 to $49,216.34 and, therefore, decreased the amount of his chargeable assets from $1,078 to $117.67. consequently, this reduced Holmes' total ability to pay for his inpatient care to $1,138.67 effective December 3, 2003, and $1,154.67 effective January 1, 2004, for each following month. Holmes' ability to pay for his outpatient care was determined by subtracting $730 from his Social Security benefits of $1,087 and then adding $117.67 (2 percent of his chargeable assets). This amounted to $474.67.
During the hearing, DHHS acknowledged that its calculations for inpatient and outpatient care did not take into account Holmes' monthly liabilities, including the monthly mortgage payment of $604.41 and the utilities for his house. However, DHHS' representative testified that DHHS had not been provided with that information and that even if provided with the information, DHHS would consider these monthly liabilities only in an undue hardship determination. Because Holmes had excess assets, he would not qualify for such a determination.
In response, Patricia offered into evidence exhibit 20, which provided the monthly calculations of Holmes' mortgage payment, his utilities, and his food. When asked if the new evidence rendered DHHS' calculations incorrect, DHHS' representative stated that she would have "some more questions that need to be answered" in relation to whether that would change her calculations.
DHHS' calculations of Holmes' ability to pay did not provide for the equity in his house to be set off from his chargeable assets because Holmes was "not living in home." DHHS regulations provide that "[c]hargeable assets of the client may exclude:... 2. The fair market value or equity in a home if it can be reasonably assumed that the client will, in the future, reside in the dwelling." See 202 Neb. Admin. Code, ch. 1, § 002 (2003).
To show that it would be reasonable to assume Holmes would not, in the future, reside in his house, DHHS offered into evidence the NRC's admission record for Holmes dated December 3, 2003. Holmes gave his address as 3216 North 120th Court, Apartment No. 28, in Omaha, which was not the address of his house. A financial questionnaire dated December 9, 2003, stated that Holmes had been living at 3216 North 120th Court for a period of 5 to 6 months. Under the "HOME" section of the financial questionnaire signed by Holmes was the following: "Don't live in it[.] 2310 N. 48th St., Omaha, NE."
At the hearing, Patricia testified that Holmes did not presently live in the house. Patricia explained that Holmes had moved back into his house for a short time after he was released from the NRC, but that in June 2004, he moved into an apartment pursuant to a recommendation from his doctor. Patricia testified that an order authorizing the sale of Holmes' house was entered in July 2005, but that the house had not yet been sold. She stated that the house was listed through a real estate broker for around $95,000 and that even though the price had been reduced from $129,000, the broker had received no offers.
After the hearing, the parties submitted briefs. DHHS' director found that DHHS' *582 calculations were consistent with the rules and regulations and therefore must be affirmed. The director stated that although the testimony of DHHS' representative was inconsistent, her final testimony was that the ability-to-pay calculations found in exhibit 22 were done correctly and that the "`liabilities'" set forth in exhibit 20 would be used only in an undue hardship determination.
Patricia appealed the director's decision to the Lancaster County District Court, claiming that DHHS' determination of Holmes' ability to pay was erroneous because DHHS did not consider all of Holmes' liabilities in determining his chargeable assets and his available unearned income.
The district court concluded that only events that occurred prior to February 2004 (when DHHS determined Holmes' ability to pay) were relevant to the determination of whether it was reasonable to assume Holmes would return to his house at some time in the future. The court found that as of February 2004, Holmes had, previous to his commitment to the NRC, resided in the house for many years. It ignored the fact that Holmes listed an address that was different from the address of his house. It also ignored the financial questionnaire signed by Holmes that stated he had been living at an address different than his house for a period of 5 to 6 months.
The district court concluded that there was no evidence whether, as of February 2004, it was reasonable to assume that Holmes would return to his house at some time in the future. The court determined that pursuant to DHHS regulations, DHHS was required to conduct an analysis as to whether, at the time of its ability-to-pay determination in February 2004, Holmes might reasonably be expected to live in his house in the future, and that because DHHS had not done so, the case must be remanded so that DHHS could conduct such an analysis.
The district court also determined whether Holmes' monthly expenses, including his mortgage payment, should be taken into account by DHHS when considering his unearned income. It found that the "personal needs allowance" within the unearned income category "must consider monthly liabilities under the Department Rules." The court noted the record reflected that DHHS had not conducted a personal needs allowance review. Instead, DHHS had reduced Holmes' monthly Social Security payment by the amount of the standard of need allowance, even though the figure was placed on the line for room and board allowance of the outpatient form and on the line for personal needs allowance of the inpatient form. The court concluded that reducing Holmes' unearned income by the amount of his mortgage payment while reducing the value of the home by the amount of the mortgage would not result in allowing Holmes double credit for the same liability. Since the record did not reflect that a personal needs allowance analysis had been conducted, a remand was required.
On September 13, 2006, the district court remanded the case for further proceedings on the issue of whether it was reason-able in February 2004 for DHHS to assume that Holmes would, in the future, reside in his house and for a personal needs allowance analysis to be conducted, including consideration of monthly liabilities under DHHS rules.

ASSIGNMENTS OF ERROR DHHS and its director (hereinafter collectively DHHS) assign two errors: The district court erred (1) in ruling that DHHS had to perform an analysis of Holmes' ability to return to his house as of *583 the time of the ability-to-pay determination and (2) in determining that the mortgage against the value of the house owned by Holmes must be considered as a liability and that the mortgage payments must be deducted from Holmes' unearned income.

ANALYSIS
In general, DHHS is required to assess against a patient such part of the cost of the patient's care by a state hospital `for the mentally ill as the patient is able to pay. See Neb.Rev.Stat. § 83-366 (Reissue 1999).
[DHHS] shall determine the ability of a patient to pay by consideration of the following factors: (1) Taxable income reportable under Nebraska law; (2) the patient's age; (3) the number of his or her dependents and their ages and mental and physical conditions; (4) the patient's length of care or treatment; (5) his or her liabilities; and (6) his or her assets including health insurance coverage.
Neb.Rev.Stat. § 83-368 (Reissue 1999).
DHHS regulations further outline the process to be followed in determining the ability of a patient at a state regional center to pay for his or her own care. "Ability to pay" is defined as "the amount determined by [DHHS] that the client or legally responsible relative can pay monthly towards the cost of services." 202 Neb. Admin. Code, ch. 1, § 002.
When a patient has taxable income, DHHS "must first determine the ability to pay from his/her taxable income." 202 Neb. Admin. Code, ch. 1, § 009 (2003). "Taxable income" is defined as "Nebraska taxable income after allowance of Nebraska personal exemption credits which are converted to income." 202 Neb. Admin. Code, ch. 1, § 002.
If a patient has insufficient taxable income to pay the cost of care, DHHS "must consider his/her chargeable assets for the purpose of paying those costs." 202 Neb. Admin. Code, ch. 1, § 010.01 (2003). The "[c]hargeable assets of a client" are defined to exclude "[t]he fair market value or equity in a home if it can be reasonably assumed that the client will, in the future, reside in the dwelling." 202 Neb. Admin. Code, ch. 1, § 002.
Finally, after taxable income and chargeable assets have been considered, unearned income is considered. 202 Neb. Admin. Code, ch. 1, § 010.03 (2003). Unearned income is defined as, but not limited to, Social Security benefits, railroad retirement benefits, military service benefits, unemployment compensation, disability benefits, workers' compensation, alimony, child support, and sick pay received on behalf of the client. 202 Neb. Admin. Code, ch. 1, § 002. Also considered in this process are liabilities, age, and the number of his or her dependents. 202 Neb. Admin. Code, ch. 1, § 008 (2003).
Because Holmes had no taxable income, DHHS first looked to his chargeable assets for the purpose of determining his ability to pay. DHHS determined that the equity in his house qualified as a chargeable asset. DHHS argues that implicit in its determination was that Holmes would not, in the future, reside in his house. It further claims that the evidence adduced at the administrative hearing supports a determination that it was reasonable to assume that Holmes would not return to his house in the future.
At oral argument, Holmes' attorney conceded that it was reasonable to assume Holmes would not return to his house. We conclude that the evidence supported this determination and that the district court erred in remanding the case for further consideration of this issue.
*584 Next, DHHS assigns as error the district court's determination that DHHS must deduct Holmes' monthly mortgage payments from his unearned income. The issue here is whether DHHS is required to consider Holmes' monthly mortgage payment, utilities, and food costs when it calculated unearned income.
A portion of the Nebraska Administrative Code entitled "FACTORS CONSIDERED IN DETERMINING ABILITY TO PAY" states: "The client's ability to pay must be determined by [DHHS] based on his/her taxable income, chargeable assets, and unearned income. Liabilities, age, and the number of his/ her dependents are also considered in this process." See 202 Neb. Admin. Code, ch. 1, § 008. In relation to the entire ability-to-pay regulatory scheme, there are three separate categories under which a client's ability to pay must be determined: taxable income, chargeable assets, and unearned income. Each of those categories may consider the client's liabilities, age, and number of dependents to the extent stated within the regulations.
The chargeable assets category states that it includes consideration of liabilities. The definition of "[c]hargeable assets of a client" excludes "Wiabilities substantiated by the client." 202 Neb. Admin. Code, ch. 1, § 002. The definitions of "[t]axable income" and "[u]nearned income" do not mention the consideration of liabilities. 202 Neb. Admin. Code, ch. 1, § 002. Thus, through the express inclusion of liabilities in the "[c]hargeable assets" category and the exclusion of the term "liability" in both the "[t]axable income" and "[u]nearned income" categories, we conclude that the regulations intended that liabilities be considered only under the chargeable assets category.
Our interpretation of these regulations is similar to that of a statute. Agency regulations that are properly adopted and filed with the Secretary of State of Nebraska have the effect of statutory law. Val-Pak of Omaha v. Department of Revenue, 249 Neb. 776, 545 N.W.2d 447 (1996). The meaning of a statute is a question of law, and a reviewing court is obligated to reach its conclusion independent of the court below and the administrative agency. See CenTra, Inc. v. Chandler Ins. Co., 248 Neb. 844, 540 N.W.2d 318 (1995).
However, this does not preclude liabilities from being considered elsewhere if the regulations allow for such consideration. DHHS regulations state: "At the request of the client or legally responsible relative, [DHHS] may consider other factors determined to be relevant in the interest of avoiding undue financial hardships. These factors may include average net monthly income, monthly liabilities, and federal poverty guidelines." 202 Neb. Admin. Code, ch. 1, § 008.03 (2003).
In the case at bar, Holmes did not request that DHHS consider his monthly liabilities, including his monthly mortgage payment, utilities, and food costs, until the time of the hearing. At the hearing, DHHS' representative testified that Holmes' monthly liabilities would be considered only in an undue hardship determination. She testified that because Holmes had chargeable assets, he would not qualify for relief through the undue hardship review. Because we have concluded that it was reasonable to assume Holmes would not return to his house, we determine that Holmes had chargeable assets, and therefore, DHHS was not required to make an undue hardship determination.
In determining a client's ability to pay from unearned income, the regulations provide that "a client with unearned income *585 or benefits must have the ability to pay the amount by which such unearned income or benefits exceed the sum of: 1. The personal needs allowance established by [DHHS]; and 2. The standard of need allowance under the Medicaid program." 202 Neb. Admin. Code, ch. 1, § 010.03.
DHHS determined that Holmes' personal needs allowance was $50 for time spent in inpatient care and $730 for time spent in outpatient care, and DHHS deducted these amounts from his unearned income accordingly. However, DHHS incorrectly labeled the $730 amount as only an allowance for room and board. The $730 amount represented both a personal needs allowance and a standard of need allowance for the time spent in outpatient care. See Neb.Rev.Stat. § 68-1006.01 (Reissue 2003) (providing that $730 standard of need allowance includes $50 personal needs allowance).
DHHS' representative testified that the $50 amount was a personal needs allowance and that a standard of need allowance was not available to inpatient clients. DHHS regulations provide that the personal needs allowance "is established by [MRS] or based on Medical Assistance guidelines." 202 Neb. Admin. Code, ch. 1, § 002. The Medical Assistance guidelines used by the Department to establish the personal needs allowance were phrased as "standard of need for  Nursing Home, Public Institution for the Treatment of Mental Diseases and/or Mental Retardation" and provided for a $50 allowance.
Because of the way the Medical Assistance guidelines were phrased  including the term "standard of need"  the district court found that DHHS had made only a standard of need allowance assessment but had called it a personal needs allowance. In actuality, DHHS had calculated a personal needs allowance albeit confusingly. And since no standard of need allowance was available for inpatient care, DHHS' assessment of Holmes' personal needs allowance was the only allowance that DHHS was required to assess for inpatient care. Thus, DHHS was correct in determining that $50 should be deducted from Holmes' unearned income for the time he spent in inpatient care and that $730 should be deducted from Holmes' unearned income for the time he spent in outpatient care.

CONCLUSION
The district court erred in requiring DHHS to perform an analysis of Holmes' ability to return to his house as of the time of the ability-to-pay determination made by DHHS and erred in remanding the case for a personal needs analysis. DHHS was correct in its determination of Holmes' ability to pay for his care from the NRC. We therefore reverse the judgment of the district court for Lancaster County and remand the cause with directions to reinstate the director's order.
REVERSED AND REMANDED WITH DIRECTIONS.